823 So.2d 325 (2002)
In re Judge Sharon K. HUNTER, Criminal District Court for the Parish of Orleans.
No. 2002-O-1975.
Supreme Court of Louisiana.
August 19, 2002.
Rehearing Denied August 21, 2002.
*326 Steven R. Scheckman, Special counsel, Mary F. Whitney, Asst. Special Counsel, Tatiana J. Lopez, Office of Special Counsel.
Nancy E. Rix, Commission Legal Counsel, Hugh M. Collins, PhD., Chief Executive Officer, Judiciary Commission of Louisiana.
James E. Boren, Baton Rouge, for Respondent.

ON RECOMMENDATION FOR DISCIPLINE FROM THE JUDICIARY COMMISSION OF LOUISIANA
CALOGERO, Chief Justice.
This judicial discipline matter comes before the court on the recommendation of the Judiciary Commission of Louisiana, a constitutional body charged with initiating disciplinary action against a judge, that Judge Sharon K. Hunter of the Criminal District Court for the Parish of Orleans, *327 State of Louisiana, be removed from judicial office and ordered to reimburse the Commission the costs incurred in the investigation and prosecution of the case. The Commission conducted an investigatory hearing, made findings of fact and conclusions of law, and determined that respondent violated Canon 3(B)(1) of the Code of Judicial Conduct and La. Const. art. V, § 25(C) by her utter failure to administer competently Section C of the Criminal District Court and by her lack of cooperation with the Court of Appeal, Fourth Circuit.
After reviewing the record, we find that the charge against respondent is supported by clear and convincing evidence. The facts in this case are not generally in dispute, given that the respondent has admitted to the conduct charged. Therefore, the only issue before us is the appropriate discipline to impose. The record shows that Judge Hunter repeatedly failed to produce transcripts timely, accurately, or frequently not at all, resulting to date in eleven appellate reversals of serious felony criminal convictions and sentences for violation of the defendants' constitutional right to judicial review. Furthermore, the consequences of these reversals to the State and the general public are both extensive and grave, because the reversals have necessitated retrials, have frequently disrupted the State's successful prosecution of very serious crimes, and have significantly undermined the public's confidence in the judicial system.[1] Thus, Judge Hunter's failure to maintain professional competence in the administration of her court, as required by Canon 3B(1) of the Code of Judicial Conduct, constitutes persistent, public conduct prejudicial to the administration of justice that has brought her judicial office into disrepute in violation of La. Const. art. V, § 25(C).
Furthermore, the record also establishes that Judge Hunter willfully and persistently refused to comply with supervisory orders from the court of appeal directing the production of necessary trial transcripts, resulting in the commencement of contempt proceedings before the court of appeal. Judge Hunter's continuous and intentional refusal to cooperate with the appellate court by timely complying with its administrative orders, as required by Canon 3B(1) of the Code of Judicial Conduct, constitutes willful and persistent failure to perform her duty, as well as persistent, public conduct prejudicial to the administration of justice that brings the judicial office into disrepute. La. Const. art. V, § 25(C).
In light of the gravity of the consequences of Judge Hunter's misconduct, both past and likely future, as well as the minimal prospect of Judge Hunter sufficiently improving her woefully inadequate administrative abilities, the risk of further harm to the judiciary and the general public should she remain on the bench is too great. Accordingly, for the reasons that follow, we agree with the Judiciary Commission that Judge Hunter's conduct warrants removal from judicial office.

JURISDICTION AND BURDEN OF PROOF
This court is vested with exclusive original jurisdiction in judicial disciplinary proceedings by La. Const. art. V, § 25(C), which provides:
On recommendation of the judiciary commission, the supreme court may censure, suspend with or without salary, *328 remove from office, or retire involuntarily a judge for willful misconduct relating to his official duty, willful and persistent failure to perform his duty, persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute, conduct while in office which would constitute a felony, or conviction of a felony. On recommendation of the judiciary commission, the supreme court may disqualify a judge from exercising any judicial function, without loss of salary, during pendency of proceedings in the supreme court. On recommendation of the judiciary commission, the supreme court may retire involuntarily a judge for disability that seriously interferes with the performance of his duties and that is or is likely to become permanent. The supreme court shall make rules implementing this Section and providing for confidentiality and privilege of commission proceedings.
Pursuant to its supervisory authority over all lower courts, this court adopted the Code of Judicial Conduct, effective January 1, 1976, and amended July 8, 1996. The Code is binding on all judges, and violations of its Canons can, without more, serve as the basis for the disciplinary action provided for by La. Const. art. 5, § 25(C). In re Jefferson, 99-1313, p. 3 (La.1/19/00), 753 So.2d 181, 184-85; In re Bowers, 98-1735, p. 7 (La.12/1/98), 721 So.2d 875, 879; In re Quirk, 97-1143, p. 4 (La.12/12/97), 705 So.2d 172, 176; In re Marullo, 96-2222, p. 3 (La.4/8/97), 692 So.2d 1019, 1021; In re Decuir, 95-0056, p. 7 (La.5/22/95), 654 So.2d 687, 692; In re Chaisson, 549 So.2d 259 (La.1989).
The charge or charges against a judge must be proved by clear and convincing evidence before this court can impose discipline. In re Bowers, 98-1735 at p. 7, 721 So.2d at 880; In re Johnson, 96-1866, p. 7 (La.11/25/96), 683 So.2d 1196, 1199; In re Huckaby, 95-0041, p. 6 (La.5/22/95), 656 So.2d 292, 296. This standard requires that the level of proof supporting the charge or charges against a judge must be more than a mere preponderance of the evidence, but less than beyond a reasonable doubt. In re Bowers, 98-1735 at p. 7, 721 So.2d at 880; In re Quirk, 97-1143 at p. 4, 705 So.2d at 176; In re Huckaby, 95-0041 at p. 6, 656 So.2d at 296.

PROCEEDINGS BEFORE THE JUDICIARY COMMISSION
Judge Hunter assumed her office on October 8, 1996. On September 11, 2000, New Orleans District Attorney Harry Connick filed a complaint against Judge Hunter with the Judiciary Commission. Mr. Connick reported that several convictions obtained by his office had shortly before been reversed by the Fourth Circuit Court of Appeal "due to the inability of Judge Hunter's court reporters to provide a complete transcript of trial proceedings." Judge Hunter responded to Mr. Connick's complaint by letter dated October 3, 2000, placing the blame for the inadequate or missing transcripts on the court reporters who worked in her court, Section C of the Criminal District Court. After an initial inquiry into the complaint, the Commission notified Judge Hunter on October 1, 2001, that further investigation had been authorized in the matter.
On March 19, 2002, while the Commission's investigation was proceeding, this court appointed retired Judge Jerome M. Winsberg as Supernumerary Judge pro tempore of Section C. By this appointment, Judge Winsberg temporarily assumed "full and complete authority to discharge any and all administrative functions of Section *329 C for the period of this Order,"[2] and Judge Hunter was relieved of all administrative duties and responsibilities relating to her office. This court then issued an order dated March 22, 2002, directing the Commission to conduct a preliminary hearing to determine whether there was probable cause to suspend Judge Hunter on an interim basis for failing "to exercise her administrative responsibilities in a competent and/or professional manner."
Pursuant to the court's order of March 22, 2002, the Commission conducted a preliminary hearing on April 19, April 20, May 17, and May 18, 2002. On April 23, 2002, after the first two days of the preliminary hearing were concluded, the Commission filed formal charges against Judge Hunter in case No. 0177, alleging that she failed to supervise her staff competently, failed to supervise competently the preparation of the minutes of her section of court, failed to supervise competently the preparation of trial transcripts and the preparation of records on appeal, and failed to cooperate fully with the Fourth Circuit Court of Appeal responsive to orders from that court to produce transcripts of proceedings conducted in Section C, to the extent that the Fourth Circuit has held Judge Hunter in contempt of court. Following the preliminary hearing, the Commission issued a recommendation of suspension, and on June 12, 2002, this court unanimously ordered that Judge Hunter be suspended pending further proceedings. In re Hunter, 02-1543 (La.6/12/02), 821 So.2d 479.
The Commission conducted a hearing on the formal charge on June 14 and 15, 2002, and filed its recommendation of discipline in this court on July 18, 2002. The Commission found that the allegations asserted in the charge had been proved by clear and convincing evidence, and further made numerous findings of fact and conclusions of law. The Commission ultimately concluded that Judge Hunter violated Canon 3B(1) of the Code of Judicial Conduct both by her utter failure to administer competently Section C of Orleans Criminal District Court and by her lack of cooperation with the Court of Appeal, Fourth Circuit. The Commission recommended to this court that Judge Hunter be removed from judicial office.

FORMAL CHARGE
Charge No. 0177, which is set forth in more detail in the attached appendix, alleged that Judge Hunter failed to supervise and direct her employees in a competent manner and that such failure resulted in a high attrition rate, which in turn negatively affected her ability to provide transcripts to the court of appeal for appellate review and to comply timely with the Fourth Circuit's orders directing her to produce transcripts. More specifically, the Commission alleged that the respondent failed to produce transcripts timely and accurately, or even altogether, in twenty-nine cases, eleven of which resulted in reversal by the court of appeal on the basis of missing transcripts. The charge also cites the extensive media coverage surrounding the administrative failures in Judge Hunter's court, asserting that the publicity caused members of the public to view in a negative light the judicial system *330 in Orleans Parish Criminal District Court.[3] The charge further alleges that, during the period of time in which Judge Hunter served as her own minute clerk, the minute clerk's duties and responsibilities were performed in an inadequate and substandard manner. Lastly, the Commission alleged that Judge Hunter's conduct violated Articles of the Louisiana Constitution of 1974 and the Code of Judicial Conduct.

FACTS
As previously noted, the facts in this case are not in dispute, since the respondent through her counsel and by her own testimony has admitted the allegations contained in the charge.[4] Therefore, and also in light of the record evidence, we find that the factual allegations asserted in the charge have been proved by clear and convincing evidence. Furthermore, we *331 adopt in whole the Commission's factual findings, as these findings are well supported by the record evidence.
In eleven of the twenty-nine cases cited in the formal charge, including one decided since the filing of the charge, Judge Hunter's failure to provide complete transcripts resulted in reversals by the court of appeal for violation of the defendants' right to judicial review guaranteed by La. Const. art. I, § 19.[5] Four of these involved convictions for first or second degree murder where life sentences had been imposed. Of these four cases, two have been retried: One case upon retrial resulted in acquittal, because an eyewitness subsequent to the first trial had developed a "very sketchy" memory, according to the statement from the prosecuting attorney.[6] The other case on retrial resulted in a manslaughter conviction and sentence of forty years at hard labor, because two witnesses could not be located and the defendant's own testimony could not be impeached without the transcript from the first trial, according to the assistant district attorney's statement. In the third case, the defendant pleaded guilty to manslaughter in exchange for a sentence of twenty years. The assistant district attorney explained that several key witnesses could not be located for the retrial, and that this prompted the plea agreement. In the fourth case, the State's application for supervisory writs is pending in this court.
Three of the eleven involved either attempted first degree murder or serious drug offenses, all three resulting in life sentences under the habitual offender law. One of these cases was dismissed because it could not be retried, and the other two are pending on remand. The remainder of the eleven resulted either in the same or a reduced sentence or are pending on remand.
In seventeen of the twenty-nine cases, Judge Hunter refused to comply with initial and second orders of the appellate court until she was threatened with the commencement of contempt proceedings in a show cause order. In seven of these cases, the requested transcript could not be produced, two have since been reversed by the court of appeal, two were affirmed upon a finding of no prejudice, and the remainder are pending. In two of these cases, a show cause hearing was conducted. Following the first show cause hearing in May of 1999, Judge Hunter was given an additional forty-eight hours to produce the requested transcript. She was also cautioned at that time that she must respond in some manner to the appellate court's orders. Following the second show cause hearing in January of 2001, the appellate panel found Judge Hunter in contempt of court, but allowed *332 her additional time to produce the requested transcript.
In the three remaining cases, Judge Hunter complied with the appellate court's requests only after several orders had been issued. In two cases, both of which are pending in the appellate court, Judge Hunter certified that the tapes of the trial or other proceeding could not be located.
The record supports the Commission's finding that there was a high turnover of staff, including court reporters and minute clerks, caused by Judge Hunter's poor supervision and management of her employees.[7] The record also evidences Judge Hunter's frequent replacement of minute clerks and the fact that she took the highly unusual step of personally serving as her own minute clerk for lengthy periods of time during her five and a half years on the bench. The record testimony reveals a total disorganization of court reporter's tapes, resulting in many missing tapes that could not be located for lengthy periods of time, and some tapes that remain lost.[8] Additionally, the record shows a pattern by Judge Hunter of assigning court reporters to other court jobs, including serving as minute clerk, thereby preventing the court reporters from preparing transcripts in a timely fashion, re-filing tapes, and organizing his or her own tapes and those that were in disarray when the court reporter started the job. Finally, the record establishes that Judge Hunter sometimes did not timely assign the preparation of transcripts to court reporters following service of an order from the Fourth Circuit to produce a transcript.

ANALYSIS
We next turn to whether Judge Hunter's conduct violated the Canons of the Code of Judicial Conduct and La. Const. art. V, § 25(C). Canon 3B(1) provides that a "judge shall diligently discharge the judge's administrative responsibilities without bias or prejudice and maintain professional competence in judicial administration, and should cooperate with other judges and court officials in the administration of court business." Furthermore, Article V, § 25(C) of the Louisiana Constitution provides that a judge may be disciplined for her "willful and persistent failure to perform [her] duty" and for "persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute." The record evidence is clear and convincing, and the respondent concedes, that her repeated failures to produce transcripts timely and accurately, resulting to date in eleven reversals of criminal convictions, and her continuous lack of cooperation with the court of appeal in securing transcripts for appellate review, violated both the Louisiana Constitution and the Code of Judicial Conduct.
Having determined that Judge Hunter violated Canon 3B(1) of the Code *333 of Judicial Conduct, as well as the constitutional standard set forth in La. Const. art. V, § 25(C), we must now decide the appropriate discipline to impose. The Commission has recommended that Judge Hunter be removed from judicial office, and, as Article V, § 25(C) provides, our authority to remove a judge from office can be invoked only upon the Commission's recommendation. In re Huckaby, 95-0041, p. 4 (La.5/22/95), 656 So.2d 292, 295. The respondent contends in her brief to this court that removal from office may be appropriate for those cases involving fraud, theft or "something evil." The respondent maintains that her only offenses are inexperience, negligence, and perhaps pride, rather than malicious or intentional acts. Thus, she argues that removal from office is not warranted in her case, that she has been adequately punished in the public square already, and that some lesser sanction, perhaps a period of suspension with conditions such as supervision and continuing education, be imposed.
Removal of a judge from duly-elected office is undoubtedly the most severe sanction this court may impose under the authority granted to us by the constitution. Not only is the judge removed from his or her present judicial office, but removal also precludes the former judge from becoming a candidate for judicial office for a minimum of five years and until his or her eligibility to seek judicial office is certified by this court. See La. Sup Ct. Rule XXIII, § 26. Consequently, we recognize that removal of a duly-elected member of the judiciary is "an extremely serious undertaking that should be carried out with the utmost care because it disrupts the public's choice for service in the judiciary." In re Jefferson, 99-1313, p. 17, 753 So.2d at 194; see also In re Huckaby, 95-0041, p. 5, 656 So.2d at 295.
On the other hand, the constitution "vests in this court the duty to preserve the integrity of the bench for the benefit of the public `by ensuring that all who don the black robe and serve as ministers of justice do not engage in public conduct which brings the judicial office into disrepute.'" In re Jefferson, 99-1313, p. 17, 753 So.2d at 194 (quoting In re Huckaby, 95-0041, p. 10, 656 So.2d at 298). To that end, we have recognized that the primary purpose of the Code of Judicial Conduct is "to protect the public rather than to discipline judges." In re Shea, 02-0643 (La.4/26/02), 815 So.2d 813, 815; In re Marullo, 96-2222 (La.4/8/97), 692 So.2d 1019. Likewise, the objective of a judicial disciplinary proceeding "is not simply to punish an individual judge but to purge the judiciary of any taint." In re Chaisson, 549 So.2d at 267.
We are mindful that the people have a right under our state constitution to elect to judicial office the man or woman of their choosing, La. Const. art. V, § 22(A), so long as that individual meets the qualifications required of him or her to be a candidate. See La. Const. art. V, § 24. Logically, the people also have the correlative right to remove an incumbent judge whom they believe to be unworthy, for whatever reason, of the honor of serving them as a judge, but they may accomplish that objective only by refusing to re-elect him or her when that judge stands for reelection. However, our state constitution, which the voters adopted on April 20, 1974, provides for a means of removing a sitting judge from judicial office under certain prescribed circumstances. See La. Const. art. V, § 25(C).[9] The power to remove *334 from office a sitting judge, and thereby counter the decision of the voters, is most assuredly an awesome responsibility. But the duty to exercise that authority has been vested in, and entrusted to, this court by the people of this state through our constitution, and it is an obligation to the people of this state that we are required to take seriously. As more eloquent justices of this court have written:
As was said in the case of State v. Lazarus, 39 La.Ann. 142, 1 So. 361, 376 [1887], the framers of our constitution, acting upon the idea contained in the paternal recommendation of the first, the great Chief Justice of Louisiana, Judge [Francis Xavier] Martin, that `All those who minister in the temple of justice, from the highest to the lowest, should be above reproach and suspicion. None should serve at its altar whose conduct is at variance with his obligations,' have imposed on us the duty of seeing `to it that none but able, conscientious, and irreproachable judges should, by (our) decree, be ever retained as magistrates in the state of Louisiana' and, however unpleasant the task may be `it must be performed impartially and fearlessly.'
Perez v. Meraux, 201 La. 498, 547, 9 So.2d 662, 678 (1942).
With this responsibility and duty in mind, we turn to the question of what factors and considerations should guide us in this case in exercising our constitutional authority to remove a judge from office. In determining the appropriate sanction to be imposed in non-removal cases, we have considered the following non-exclusive list of factors:
(a) whether the misconduct is an isolated instance or evidenced a pattern of conduct; (b) the nature, extent and frequency of occurrence of the acts of misconduct; (c) whether the misconduct occurred in or out of the courtroom; (d) whether the misconduct occurred in the judge's official capacity or in his private life; (e) whether the judge has acknowledged or recognized that the acts occurred; (f) whether the judge has evidenced an effort to change or modify his conduct; (g) the length of service on the bench; (h) whether there have been prior complaints about this judge; (i) the effect the misconduct has upon the integrity of and respect for the judiciary; and (j) the extent to which the judge exploited his position to satisfy his personal desires.
In re Chaisson, 549 So.2d 259, 266 (La. 1989) (quoting Matter of Deming, 108 Wash.2d 82, 736 P.2d 639, 659 (1987)). See, e.g., In re McInnis, 00-1026 (La.10/19/00), 769 So.2d 1186.
In cases wherein the judge was removed from office, we have cited the guidelines noted In re Whitaker, 463 So.2d at 1303, itself a non-removal case. See, e.g., In re Johnson, 96-1866, p. 15-16, 683 So.2d at 1202. The Whitaker court stated:
[t]he most severe discipline should be reserved for judges who use their office improperly for personal gain; judges who are consistently abusive and insensitive to parties, witnesses, jurors and attorneys; judges who because of laziness or indifference fail to perform their *335 judicial duties to the best of their ability; and judges who engage in felonious criminal conduct.
Whitaker, 463 So.2d at 1303 (emphasis supplied).
However, this court more recently stated that the four types of conduct recognized in Whitaker as warranting removal "were not intended as an exclusive list of the types of conduct for which a judge can be removed from office." In re Huckaby, 95-0041, p. 7, 656 So.2d at 296-97. The Huckaby court explained:
Indeed, both La. Const. art. V, § 25 and the Code of Judicial Conduct contemplate, and allow, removal for a broader range of offenses than the illustrative list set forth in Whitaker. Under Article V, § 25(C), a judge may be removed from office for, among other things, persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute, and ... violations of the Canons of the Code of Judicial Conduct also serve as a basis for imposition of judicial discipline. As such, our inquiry in this case is narrow: Did respondent's conduct [violate Canons of the Code of Judicial Conduct] and is that conduct "persistent public conduct prejudicial to the administration of justice that brings the judicial office into disrepute" to such an extent that respondent should be removed from office?
Id., 95-0041, pp. 7-8, 656 So.2d at 296-97. See also In re Jefferson, 99-1313, p. 18, 753 So.2d at 194 (noting that persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute is "alone, sufficient to constitute grounds for removal").
Accordingly, in the instant case, we must determine whether Judge Hunter's conduct violated Canon 3B(1) of the Code of Judicial Conduct and whether that conduct constituted "willful and persistent failure to perform [her] duty" or "persistent public conduct prejudicial to the administration of justice that brings the judicial office into disrepute" to such an extent that respondent should be removed from office. As we previously found, the record establishes by clear and convincing evidence, and the respondent concedes, that her repeated failures to provide transcripts, resulting in eleven reversals involving felony convictions to date, and her refusals to comply with the orders of the appellate court violated Canon 3B(1), because her conduct was a failure to "maintain professional competence in judicial administration," and because it constituted a failure to "cooperate with other judges and court officials in the administration of court business." Clearly, the respondent's conduct in failing to provide transcripts and to comply with the orders of a superior court amounted to the "willful and persistent failure to perform [her] duty" to administer her court in a professional and competent manner. Respondent also concedes that her conduct in violating Canon 3B(1) was "persistent public conduct prejudicial to the administration of justice that brings the judicial office into disrepute." Judge Hunter's conduct prejudiced the administration of justice and brought her judicial office into disrepute because of the serous consequences of her failures, which resulted both in the denial of many defendants having a fair, constitutionally-mandated review of their felony convictions, and in the corresponding deprivation of the State's and the public's entitlement to see justice done.
Judge Hunter argues that her conduct amounts to gross negligence at most, that the problems have been resolved, and that she can be rehabilitated. It is true that there is no proof in the record that the respondent maliciously intended *336 to fail in performing her administrative duties, but the fact is that she did fail in performing her administrative duties and supervising staff, whether stemming from inexperience, negligence, or pride, as the respondent asserts, or just personal or professional ineptitude.[10] Moreover, her failure, as we have previously explained, has been gravely prejudicial to the administration of justice and has brought her judicial office into disrepute. "[A] judge may also, through negligence or ignorance not amounting to bad faith, behave in a manner prejudicial to the administration of justice so as to bring the judicial office into disrepute." In re Quick, 553 So.2d 522, 524 (Miss.1989) (a case in which the judge was removed from office for failure to file abstracts and reports of twenty-eight DUI and 552 traffic convictions to the proper state agencies).
Especially in cases where incompetence is at issue, the proper focus in deciding "whether removal is the appropriate solution depends not only on the magnitude of the violation but also on the probability of the violation's recurrence. If the violation is likely to recur, removal is appropriate." Matter of Field, 281 Ore. 623, 635, 576 P.2d 348, 354 (1978); see also In re Baber, 847 S.W.2d 800, 803 (Mo.1993) ("[W]hen incompetency is alleged the court's task is to determine whether the conduct at issue establishes that the respondent lacks the requisite ability, knowledge, judgment, or diligence to consistently and capably discharge the duties of office he or she holds."). Applying this approach, we conclude that the consequences of Judge Hunter's conduct, both past and future, are too grave, and the likelihood of recurring harm to the justice system and the public is too great, should she remain on the bench.
In Judge Hunter's case, there can be no dispute as to the magnitude of the violation of the Code of Judicial Conduct and the resulting harm caused to the administration of justice by the respondent's failure to provide accurate and timely transcripts for appellate review of criminal convictions and by her failure to comply with the administrative orders of the court of appeal. This failure resulted in the complete denial of the right to judicial review, guaranteed by La. Const. art. I, § 19 for at least eleven criminal defendants, as well as in the deprivation of the State's and the public's right to see justice done. Additionally, the number of cases that may eventually result in reversals and remands for new trials, with the possible disruption unfavorable to the State of the original conviction and sentence, will likely increase as cases pending in the appellate pipeline and in the court of appeal proceed to final judgment.[11] The reversals, of course, require remands for retrials that tax an already over-burdened criminal justice system.
The respondent's delays in producing transcripts, when they are produced, or in certifying to the court of appeal that tapes cannot be located, necessarily lengthens *337 the appeal process, both to the detriment of the defendant, the State, and the general public. For example, as several assistant district attorneys testified, going to trial years later, particularly without a transcript of the first trial, works a hardship on the State when witnesses are no longer available or their memories have faded. Some of the new trials have resulted in convictions for lesser offenses, acquittals, or dismissals.
The procedural history of the Boatner case, in which the appellate court on August 14, 2002, reinstated and affirmed a conviction and sentence it had initially reversed and vacated, exemplifies the harm caused by missing transcripts, as well as the effect on the justice system of poor administration. See Note 5, supra. Without a full transcript, the defendant is denied his right to judicial review under La. Const. art. I, § 19. However, the State, as well as the crime victims and the public in general, are equally denied the opportunity to ensure that a lawful conviction and sentence are upheld on appeal. The court of appeal in the Boatner case ultimately deemed the conviction and sentence to be lawful, but had the missing transcript not been found at the eleventh-hour, the State would have been forced to re-try a defendant who had already been tried. Additionally, the roller-coaster ride consisting of the trial, the conviction and sentence, the delay in the appeal while the search is made for the missing tape, the reversal of the conviction and sentence, the preparation for trial on remand, the discovery of the tape, the petition for rehearing, and the reinstatement of the conviction and sentence, surely takes a psychological, as well as financial, toll on the parties involved, not to mention the justice system itself.
As the Oregon Supreme Court has explained: "[T]he district courts of this state are, in reality, the `People's Courts,' and for many it may be the only contact they will ever have with our courts. `The impressions they receive serve to shape their opinion of the judicial system, our laws and law enforcement. We cannot permit that opinion to be anything but one of confidence and respect.'" Matter of Field, 281 Ore. at 637, 576 P.2d at 355 (citation omitted). For example, the negative impact of reversals based solely on missing transcripts, upon the families of the victims, is readily revealed in the testimony of Sylvia Barnes and Cheryl Thompkins Malveaux. Ms. Barnes's son Todd was killed by Irwin Clark, who was originally convicted of second degree murder and sentenced to life imprisonment, but on re-trial he was convicted of manslaughter and sentenced to twenty years in prison. Ms. Barnes stated she was angry with Judge Hunter "for doing such a poor job." Ms. Malveaux's baby daughter was killed by Raynell Bright, who was convicted of first degree murder and sentenced to life imprisonment, but his conviction and sentence were recently reversed by the court of appeal. Ms. Malveaux commented that, "If you can't do a job, leave it to people who can." As evidenced by the widespread reporting of Judge Hunter's reversals in the local media, coupled with the negative view of the people who have actually come before Judge Hunter's court, the judge's unprofessional conduct has undoubtedly inflicted significant damage on her court in particular and the judiciary in general. Compare In re Jefferson, supra.
Moreover, harm to the administration of justice may continue to be inflicted by Judge Hunter's administrative failures. The supernumerary judge testified that the administrative problems he found in Section C are "vast" and problems are uncovered "daily." Those administrative problems, set forth in more detail in the Commission's Findings of Fact, relate to *338 poorly organized case files, missing portions of records, poorly drafted or nonexistent minute entries, numerous unsigned motions for appeal, and even cases that have just "fallen off the docket." These failures may yet have negative legal repercussions for the defendant or the State, and certainly do not cast the court in a favorable light. In short, Judge Hunter's failure to administer her court in a professionally competent manner amounts to willful and persistent failure to perform her administrative duties, the likes of which can be found in no reported Louisiana case, and to persistent, public conduct that has been profoundly prejudicial to the administration of justice and which has brought her court into notorious disrepute.
Judge Hunter contends that the administrative problems in Section C will not recur and that she has taken steps to address and resolve the deficiencies. The Judiciary Commission did not believe that Judge Hunter had, concluding that her efforts were too long in coming and insufficient. The record supports that conclusion in which we concur. The gravity of the consequences, past and likely future, and the minimal prospect of Judge Hunter adequately improving her administrative skills do not warrant subjecting the public to the risk of harm that would attend her remaining on the bench. The record evidences a pattern of gross negligence, if not almost complete incompetence, in the respondent's administration and management of her court. Judge Hunter's failure to administer her court in a professionally competent manner has resulted in eleven reversals so far, with the first one occurring in October of 1998, and the most recent in April of 2002, and more reversals are possible. Following the first reversal in October of 1998, State v. Bell, Judge Hunter says she did not recognize a problem. She explained that the court reporter had not returned the tapes when the reporter left her employ and that she had set status conferences five times in an effort to locate the tapes. The second reversal occurred in May 1999, State v. Bacot. Judge Hunter explained that she had a meeting thereafter with her court reporters and asked them to integrate the tapes into one group; she was satisfied that they understood what was expected of them. The third reversal in March 2000, State v. Noel, "startled" her. Judge Hunter recalled that she had had a disagreement with the court reporter about the preparation of the transcript and stated that she had not been aware that a portion of the transcript was unavailable. The fourth case, State v. Hernandez, was reversed two months later in May 2000. Judge Hunter again explained that she used a procedure in which she set status conferences for the then-working court reporter to keep her informed about the search for the lost tapes. She could not recall the court reporter who was assigned this task, noting that she had "a turnover." More reversals followed in July of 2000, November of 2000, December of 2000, March of 2001, January of 2002, February of 2002, and April of 2002. There is no indication from the record that Judge Hunter, as the reversals began to mount, changed or improved her method of dealing with the administrative problems.
The testimony of former court reporters revealed that the organization of the files and tapes in Section C was chaotic. Judge Hunter would often assign court reporters to perform tasks other than transcribing and would hold status hearings even if the reporter were not present. Also, Judge Hunter would delay advising the court reporter that the Fourth Circuit had ordered production of a transcript. Judge Hunter explained that she understood failure as "doing nothing," and she insisted to the *339 Commission that she had continued to work at trying to produce the tapes. However, it is clear that Judge Hunter's actions were ineffective and that, even as the reversals began to accumulate in early 2000, she did not change or improve her methods, nor did she genuinely and sincerely seek outside assistance. Indeed, the respondent concedes in her brief to this court that she declined most offers of assistance from other judges because of pride.
While gross negligence in managing staff and organizing tapes might not constitute willful or intentional misconduct, the respondent's failure to cooperate with the court of appeal and to comply with its orders, as required by the Code of Judicial Conduct, does qualify as willful misconduct. At the same time that the reversals were being handed down, the appellate court was also ordering Judge Hunter to produce transcripts in other cases, but she continued to employ unsuccessful administrative strategies, and more often than not simply did not respond to the court of appeal.
The court of appeal's process generally consisted of three orders. The first order would inform the responsible person, usually Judge Hunter given the high turnover of court reporters in her section, that the transcript was to be prepared and submitted to the Judicial Administrator within a certain number of days. If there were no compliance, by submission of either the transcript or a certificate asserting that the tapes could not be located, the second order would note the previous order, the failure to comply with that order, and again instruct the judge to produce the transcript by a certain date or be subject to a contempt order. First orders, and occasionally second orders, the testimony shows, were not unusual among the sections of Criminal District Court. A third order directed to a judge, however, was relatively rare, according to the Staff Director of the Fourth Circuit. This third order, a show cause order, would demand compliance by a certain date or instruct the judge to appear before the court of appeal en banc on a certain date.
Judge Hunter in seventeen cases, commencing as early as April of 1999 and continuing until March of 2002, when this court appointed a supernumerary judge to handle administrative matters in Section C, repeatedly failed to comply with orders of the court of appeal, or even to communicate with the appellate court, until she was threatened with commencement of contempt proceedings by a show cause order. Indeed, contempt proceedings were commenced and a hearing held in May of 1999 in the case of State v. James. Judge Hunter appeared late at the hearing before the panel, explaining that she had been involved in jury selection in her court and that she had not been aware of the proceeding, despite the record of personal service upon her. Judge Hunter stated to the appellate panel that she had been misled by her court reporter into believing that the order had been complied with, implying that she did not need to appear. One member of the panel informed her that when the court orders her to do something, she should respond in some manner, or the court will deduce that she is ignoring it.
Nonetheless, orders, including show cause orders, were continually issued throughout 2000 and into 2001. In January of 2001, the court of appeal again commenced contempt proceedings, following which the respondent was found to be in contempt of court. At that proceeding, the panel expressed frustration with Judge Hunter's failure to communicate with the court. Show cause orders, however, continued to be issued throughout 2001 and *340 early 2002, until the supernumerary judge was appointed to Section C. This record clearly evidences the respondent's willful and persistent refusal to cooperate with the appellate court in securing transcripts for judicial review, conduct that did not ameliorate in any measurable amount, as show cause orders continued to be served on the respondent, even after the first and second contempt hearings. The administrative problems in the district court came to this court's attention and prompted the appointment of a supernumerary judge to take over administrative duties for Section C. Though the Commission noted some improvement in administration prior to the appointment of the supernumerary judge, primarily the hiring in mid 2001 of two court reporters who remain in the Section, it is clear from the record that the majority of respondent's actions were not sufficient to remedy the serious problems existing in Section C. Indeed, some of the respondent's remedial actions, for example, her decision to take over the minute clerk duties herself at various times, resulted in even more administrative failures. Though Judge Hunter believes that tapes for proceedings heard in 2001 and thereafter have been organized and will be obtainable, she remains unsure about earlier trials, conceding that some tapes are missing. Notably, the eleven reversals to date concern trials or proceedings that were conducted for the most part in 1997 and 1998, with one having been conducted in 1999 and two in 2000. Many of the show cause orders concern trials or proceedings conducted in 1998 and 1999, with several having been conducted in 2000. In short, Judge Hunter was put on notice at least as early as May of 1999 that she had a duty to cooperate with the Fourth Circuit in securing record transcripts for appellate review; yet, rather than take ameliorative action to improve her compliance record, she continued a pattern of willful refusal to cooperate with a superior court.
In determining an appropriate sanction, consideration by the Commission of closed files of prior proceedings is specifically authorized by La. Sup.Ct. Rule XXIII, § 3(d). In re Soileau, 502 So.2d 1083 (La.1987). We reasoned in Soileau that closed files may be useful "to show that the problem is a continuing one and not just a rare occurrence if a new complaint is based on a similar occurrence, and to determine the recommended sanction, whether the subsequent complaint is related or unrelated." Id. at 1086.
Prior complaints against the respondent do show that her inability to perform her administrative duties in a competent and professional manner is a continuing and recurring problem. The Commission reviewed the following prior complaints lodged against Judge Hunter:
Recently, in In re: Hunter, 98-0446 (La.7/8/98), 715 So.2d 1188, the Commission charged Judge Hunter with having pleaded nolo contendere in Municipal Court to six misdemeanors while in office for failing to maintain two pieces of property she owned in eastern New Orleans. Evidence introduced at the hearing was to the effect that rats infested the rental houses, grass and weeds had grown many feet high, the properties were broken into, and they were general eyesores in an otherwise well-kept subdivision. At the time of the hearing, Judge Hunter told the Commission that she had "gotten in over her head" with the properties. The Commission recommended that Judge Hunter be publicly censured for her conduct, but this court rejected the recommendation and declined to impose discipline.
File No. 97-854 involved Judge Hunter's unauthorized retention of a court reporter's paychecks. The Commission voted to *341 close the file, but cautioned Judge Hunter that the Code of Judicial Conduct requires a judge to "diligently discharge his or her administrative obligations and maintain professional competence in judicial administration."
File No. 97-788 shows that Judge Hunter employed her mother, Rosemary Hunter, as her law clerk from April 1, 1997, through May 31, 1997, in violation of the Code of Judicial Conduct. On June 2, 1998, the Commission issued a letter of admonition to Judge Hunter and advised her to "remain mindful of the Codal rule against nepotism and that the Code imposes upon you the duty to insure that members of your staff actually perform the work for which they were hired and that such work is commensurate with the job."
File No. 97-747 shows that in 1995, while Judge Hunter was still engaged in the private practice of law, she was retained to handle a personal injury claim on behalf of Rosa Martin and Lionel Johnson. The claims were settled in 1996, but Judge Hunter apparently lost the settlement checks and did not remit the settlement funds to her former clients, despite numerous requests. In September 1997, the Commission directed Judge Hunter to ensure that replacement checks were issued to settle the claims, and that upon submission of evidence that the settlement checks were reissued and received by the clients, the Commission's file would be closed. After several delays attributed to Judge Hunter, the replacement checks were issued, and the Commission closed the file in September 1998.
Additionally, in File No. 98-958, an attorney who had appeared before Judge Hunter reported that she held him in contempt and had exhibited improper temperament and demeanor. The Commission voted to close the file, but cautioned Judge Hunter that the Code of Judicial Conduct requires a judge to be "patient, dignified, and courteous in the performance of judicial duties."
Certainly the evidence introduced to support the present charge establishes a persistent pattern of willful disregard of the respondent's duty to perform her administrative duties in a competent and professional manner. However, as the prior complaints establish, the respondent's inability to handle paperwork competently, whether in her professional or private life, or to supervise staff responsibly, or, ultimately, to make professional and competent administrative and staffing decisions is both stunningly profound and grossly pervasive.
Nor can we discern from this record any real hope for the respondent's rehabilitation, without placing the justice system and individuals brought before the bar at risk again. Until the most recent hearing, Judge Hunter's position was that her administrative troubles were due to "bad hires." However, this simple statement itself, even if true, evidences her inability to make professional and competent administrative decisions as basic as hiring and retaining good workers. The fact of the abnormally high employee turnover rate in her section of court, forty-four full-time employees over sixty months, is still more evidence of administrative and management incompetence. It was not until the most recent hearing before the Commission that Judge Hunter even began to accept, much less understand, her culpability in the administrative debacle in Section C. While she did acknowledge that she is ultimately responsible for the failures of her court and staff, she did not demonstrate to any degree of confidence that she could learn from her mistakes and become a competent administrator. The Commission found her to be in bad faith, and while we cannot from this record say *342 such a conclusion is not supported by clear and convincing evidence, we can say that it appears to be a sad fact that Judge Hunter simply cannot comprehend the gravity of her offense to the individuals appearing before her, to the public at large, and to the justice system as a whole. Tellingly, Judge Hunter believed that failure, as she understood it, was to do nothing, to not act; so instead, she chose to continue to address the problem in the same manner, and even worked harder at it, even though that method continued to produce the same undesirable results. But that approach, too, constitutes failure, and Judge Hunter's inability to understand that concept at this date does not auger well for the necessarily significant improvement that would be required of her to perform her administrative responsibilities in a professional and capable manner were she to continue as a sitting judge.

CONCLUSION
Upon review of the record, we conclude that the most severe discipline is warranted in this case. Judge Hunter's utter failure to discharge her administrative duties in a diligent and professionally competent manner and her ongoing refusal to cooperate with the appellate court in securing record transcripts for appellate review has resulted in grave consequences. Judge Hunter's conduct, moreover, constitutes a willful and persistent failure to perform her duty and persistent, public conduct prejudicial to the administration of justice that brings the judicial office into disrepute. Accordingly, it is ordered, adjudged, and decreed that the respondent, Judge Sharon Hunter of Section C of the Criminal District Court for the Parish of Orleans, State of Louisiana, be, and is hereby, removed from office, and that her office be, and is hereby, declared to be vacant. Furthermore, the respondent is ordered pursuant to La. Sup.Ct. Rule XXIII, § 26 to refrain from qualifying as a candidate for judicial office for five years and until certified by this court as eligible to become a candidate for judicial office.[12] Finally, exercising the discretion allowed this court by La. Sup.Ct. Rule XXIII, § 22, we cast the respondent with $5,000.00 of the costs incurred in the investigation and prosecution of her case. Any rehearing in this matter shall be filed no later than 4:00 p.m. on Tuesday, August 20, 2002.
REMOVAL FROM JUDICIAL OFFICE ORDERED.
JOHNSON and KNOLL, JJ., concur and assign reasons.

APPENDIX

FORMAL CHARGE NO. 0177
The charge in case No. 0177, Subsection A, alleges that Judge Hunter failed to *343 perform her administrative duties by failing competently to supervise and direct her employees, including court reporters and minute clerks, and that such failure resulted in a high attrition rate, which in turn impacted Judge Hunter's ability (1) to ensure that transcripts are provided to the Fourth Circuit Court of Appeal in cases on appeal, and (2) to comply timely with the Fourth Circuit's orders directing her to produce transcripts.
Subsection B of the charge in No. 0177 relates to ten cases in which Judge Hunter's failure to provide accurate transcripts to the Fourth Circuit ultimately led to the reversal of a conviction or habitual offender adjudication, based solely upon the issue of a missing or deficient transcript. While a full procedural history for each is described below, the underscored language outlines the most relevant features and emphasizes the different outcomes for purposes of the charge against Judge Hunter.
1. State v. Michelle Noel, CDC # 385-093. Ms. Noel was convicted of second-degree murder and sentenced to life imprisonment without benefit of parole, probation, or suspension of sentence. Because the record did not contain a complete transcript of the testimony taken at trial, the Fourth Circuit found that the defendant was denied her right to meaningful appellate review and vacated the conviction and sentence. State v. Noel, 99-1415 (La.App. 4th Cir.3/1/00), 761 So.2d 823. On remand for a new trial, a jury found Ms. Noel not guilty.
2. State v. Audrey Bell, CDC # 383-127. Ms. Bell was convicted of second-degree murder and sentenced to life imprisonment without benefit of parole, probation, or suspension of sentence. The Fourth Circuit subsequently vacated the conviction and sentence because the transcript was not made part of the record. State v. Bell, 97-1615 (La.App. 4th Cir.10/21/98), 731 So.2d 558. Following remand for a new trial, a jury found Ms. Bell guilty of manslaughter; she was sentenced to serve 40 years in prison, with credit for time served.
3. State v. Irvin Clark, CDC # 378-494. Mr. Clark was convicted of second-degree murder and sentenced to life imprisonment without benefit of parole, probation, or suspension of sentence. The Fourth Circuit subsequently vacated the conviction and sentence because the record did not include a transcript of the first day of trial. State v. Clark, 00-0348 (La. App. 4th Cir.12/13/00), 776 So.2d 1249. Following remand for a new trial, the State amended the charge to manslaughter because several key witnesses were no longer available. Mr. Clark entered a plea of guilty to manslaughter and was sentenced to serve 20 years in prison, with credit for time served.
4. State v. Raynell Bright, CDC # 376-884. Mr. Bright was convicted of first-degree murder and sentenced to life imprisonment without benefit of parole, probation, or suspension of sentence. The Fourth Circuit reversed the conviction and sentence because the transcript of the trial lacked the testimony of important witnesses, including the defendant, and contained numerous errors. State v. Bright, 00-1255 (La.App. 4th Cir.2/6/02), 809 So.2d 1112. The State's application for supervisory writs from the Fourth Circuit's ruling is pending in this court, No.2002-K-0698.
5. State v. Bobby Dickerson, CDC # 392-232. Mr. Dickerson was convicted of attempted first-degree murder and sentenced to life imprisonment as a third felony offender. The Fourth Circuit reversed the conviction and sentence because *344 the trial transcript lacked the testimony of three of the four witnesses who testified at trial. State v. Dickerson, 00-2324 (La. App. 4th Cir.3/28/01), 793 So.2d 571. A new trial was pending at the time the Commission filed the instant charge against Judge Hunter.
6. State v. Donald McGee, CDC # 376-601. Mr. McGee was convicted of possession of cocaine and distribution of cocaine and sentenced to life imprisonment as a third felony offender. Citing lost transcripts, the court of appeal vacated the conviction and sentence, and remanded the case for a new trial. State v. McGee, 00-0347 (La.App. 4th Cir.7/26/00), 786 So.2d 979. Thereafter, the State entered a nolle prosequi in the case, and the defendant was released from custody.
7. State v. Raymond Jones, CDC # 379-522. Mr. Jones was convicted of possession of a Schedule I controlled dangerous substance (phencyclidine-PCP) within 1,000 feet of a school and sentenced to serve fifteen years in prison as a second felony offender. Because substantial portions of the transcript were absent from the record, the Fourth Circuit reversed the conviction and sentence, and remanded the case for a new trial. State v. Jones, 00-0298 (La.App. 4th Cir.11/21/00), 775 So.2d 718. Thereafter, the defendant's case was re-allotted to a different section of court, where he entered a plea of guilty to a lesser crime and was sentenced to serve ten years in prison with credit for time served.
8. State v. Eddie Johnson, CDC # 414-319. Mr. Johnson was convicted of possession of cocaine and possession of marijuana and sentenced to life imprisonment as a third felony offender. Because the trial transcript was absent from the record, thereby resulting in the denial of the defendant's right to appellate review, the Fourth Circuit vacated the conviction and sentence, and remanded the case for a new trial. State v. Johnson, 01-1909 (La. App. 4th Cir.1/23/02), 807 So.2d 1071.
9. State v. Pedro Bacot, CDC # 309-826. Mr. Bacot was convicted of attempted first-degree murder and sentenced to serve twenty-five years in prison as a second felony offender. The Fourth Circuit affirmed the conviction, but it vacated the habitual offender adjudication and sentence because the record lacked transcripts of the sentencing and of a hearing on a motion to quash the habitual offender bill. State v. Bacot, 98-0506 (La.App. 4th Cir.5/26/99), 739 So.2d 1027. Following remand for sentencing, Judge Hunter found Mr. Bacot was a multiple offender and sentenced him to serve twenty-five years in prison without benefit of parole, probation, or suspension of sentence, with credit for time served.
10. State v. Gregory Hernandez, CDC # 383-422. Mr. Hernandez was convicted of theft of an automobile valued at $500 or more and sentenced as a multiple offender to serve eighty months at hard labor. Because the transcript of the second day of trial was not provided, the Fourth Circuit reversed the conviction and sentence, and remanded the case for a new trial. State v. Hernandez, 99-2980 (La.App. 4th Cir.5/10/00), 761 So.2d 829. Following remand, Mr. Hernandez entered a plea of guilty as charged and was sentenced to serve forty-two months with credit for time served.
Subsection C of the charge relates to cases in which Judge Hunter failed to comply with the Fourth Circuit's orders to produce transcripts, but the cases were either affirmed on other grounds or remain pending before the court of appeal:
1. State v. Eckley Marshall, CDC # 415-530. On February 9, 2001, March 12, 2001, and May 14, 2001, the Fourth *345 Circuit ordered Judge Hunter to produce the transcript of the defendant's guilty plea and sentencing hearing. Judge Hunter did not comply with the orders. On August 7, 2001, the Fourth Circuit ordered Judge Hunter to produce the transcript on or before September 11, 2001, or appear before the court on September 14, 2001 for a contempt of court hearing. Judge Hunter complied with the Fourth Circuit's orders by providing a certificate certifying that the audiotapes of the proceeding could not be located and that the transcript could not be produced. The certificate was received by the Office of the Judicial Administrator for Orleans Parish Criminal District Court on September 14, 2001, and was received by the Fourth Circuit on September 25, 2001.
The Fourth Circuit subsequently affirmed the defendant's sentence, finding that the record was sufficient for appellate review, that Mr. Marshall did not establish he suffered any prejudice from the lack of a sentencing transcript, and that the record indicated he had knowingly and intelligently waived his rights. State v. Marshall, 01-1907 (La.App. 4th Cir.1/30/02), 812 So.2d 79.
2. State v. Steve Banks and Jamar Rolling, CDC # 390-356. On July 19, 2000, and August 29, 2000, the Fourth Circuit ordered Judge Hunter to produce the transcripts of two motion to suppress hearings. Judge Hunter did not comply with the orders. On October 2, 2000, the Fourth Circuit ordered Judge Hunter to produce the transcripts on or before November 9, 2000, or appear before the court on November 16, 2000, for a contempt of court hearing. On November 9, 2000, Judge Hunter complied with the Fourth Circuit's orders by providing a certificate certifying that one of the transcripts was unavailable.
Thereafter, on December 11, 2000 and January 23, 2001, the Fourth Circuit ordered Judge Hunter to produce the transcript of a motion hearing conducted on the second day of the defendants' trial. Judge Hunter did not comply with the orders. On March 5, 2001, the Fourth Circuit ordered Judge Hunter to produce the transcript on or before April 16, 2001, or appear before the court on April 25, 2001, for a contempt of court hearing. Judge Hunter complied with the Fourth Circuit's orders by providing a certificate certifying that the transcript was unavailable. The certificate was received by the Fourth Circuit on April 18, 2001.
On October 17, 2001, the Fourth Circuit affirmed the defendants' convictions and sentences. The court of appeal found that the absence of the transcript of the motion to suppress hearing did not preclude the defendants' exercise of their constitutional right of review because the arresting police officers had testified at the motion hearing and at trial, and had adequately recounted their reasons for stopping the defendants. State v. Banks and Rolling, 00-0525 (La.App. 4th Cir.10/17/01), 800 So.2d 28.[1]
3. State v. Todd Plaisance a/k/a Michael Thomas, CDC # 405-507. On November 9, 2000 and December 18, 2000, the Fourth Circuit ordered Judge Hunter to produce the transcript of a pre-trial motion hearing. Judge Hunter did not comply with the orders. On February 13, 2001, the Fourth Circuit ordered Judge Hunter to produce the transcript within twenty days, failing which the court would commence contempt proceedings. On March 5, 2001, the Fourth Circuit granted *346 Judge Hunter's request for a thirty-day extension of time to comply with the orders. On April 9, 2001, when the transcript still had not been filed, the Fourth Circuit ordered Judge Hunter to produce the transcript on or before May 11, 2001, or appear before the court on May 23, 2001 for a contempt of court hearing. On May 7, 2001, Judge Hunter complied with the Fourth Circuit's orders by providing a certificate certifying that the transcript could not be reproduced. The certificate was received by the Fourth Circuit on May 8, 2001.
On March 6, 2002, the Fourth Circuit affirmed the defendant's conviction and sentence. The court stated that appellate counsel also represented the defendant at trial, and that the defendant did not demonstrate how the missing portions of the transcript had prejudiced him. State v. Plaisance, 00-1858 (La.App. 4th Cir.3/6/02), 811 So.2d 1172.[2]
4. State v. Michael Harris, CDC # 413-972. On April 25, 2001, and May 23, 2001, the Fourth Circuit ordered Judge Hunter to produce the transcripts of the defendant's trial and sentencing hearing. Judge Hunter did not comply with the orders. On August 7, 2001, the Fourth Circuit ordered Judge Hunter to produce the transcripts on or before September 11, 2001, or appear before the court on September 14, 2001, for a contempt of court proceeding. Judge Hunter ultimately complied with the Fourth Circuit's orders by providing a certificate certifying that the trial transcript could not be produced. As of the date the formal charge was filed against Judge Hunter, this case was pending before the Fourth Circuit.[3]
5. State v. Matthew Whiticar, CDC # 414-151. On January 29, 2002, and March 6, 2002, the Fourth Circuit ordered Judge Hunter to produce the transcript of a motion to quash hearing. On March 21, 2002, Judge Hunter complied with the Fourth Circuit's orders by providing a certificate certifying that the transcript could not be produced. The certificate was received by the Fourth Circuit on March 26, 2002. As of the date the formal charges were filed against Judge Hunter, this case was pending before the Fourth Circuit.
6. State v. Kentrell Vance, CDC # 413-739. On January 29, 2002, and March 6, 2002, the Fourth Circuit ordered Judge Hunter to produce the transcripts of the defendant's trial, sentencing hearing, and multiple bill hearing. On March 7, 2002, Judge Hunter complied with the Fourth Circuit's orders by providing the trial transcript and by providing certificates certifying that the transcripts of the sentencing and multiple bill hearings could not be produced. As of the date the formal charges were filed against Judge Hunter, this case was pending before the Fourth Circuit.
7. State v. Tory Boatner, CDC # 406-284. Mr. Boatner was convicted of second-degree murder and sentenced to life imprisonment without benefit of parole, probation, or suspension of sentence. On January 17, 2002, and February 22, 2002, the Fourth Circuit ordered Judge Hunter to produce the transcripts of five pre-trial hearings. On March 21, 2002, Judge Hunter complied with the Fourth Circuit's *347 orders by providing the transcript of one proceeding and by providing a certificate certifying that the transcripts of the remaining four proceedings could not be produced. As of the date the formal charges were filed against Judge Hunter, this case was pending before the Fourth Circuit.[4]
Subsection D of the charge in No. 0177 relates to cases in which Judge Hunter complied with the Fourth Circuit's orders to produce transcripts, but only after the court issued numerous orders and threatened her with contempt proceedings if she did not comply, or found her to be in contempt of court:
1. State v. Katie Zeno, CDC # 411-088. On April 6, 2001, and May 22, 2001, the Fourth Circuit ordered Judge Hunter to produce the transcripts of the defendant's trial, sentencing hearing, and multiple bill hearing. Judge Hunter did not comply with the orders. On August 7, 2001, the Fourth Circuit ordered Judge Hunter to produce the transcripts on or before September 11, 2001, or appear before the court on September 14, 2001, for a contempt of court hearing. On August 29, 2001, Judge Hunter complied with the Fourth Circuit's orders by filing the transcripts with the Office of the Judicial Administrator for Orleans Parish Criminal District Court. The transcripts were received by the Fourth Circuit on October 11, 2001.
2. State v. Christopher James, CDC # 374-038. On March 31, 1998, May 27, 1998, October 16, 1998, and January 8, 1999, the Fourth Circuit ordered Judge Hunter to produce the transcript of the defendant's trial. Judge Hunter did not comply with the orders. On April 1, 1999, the Fourth Circuit ordered Judge Hunter to produce the transcript on or before May 7, 1999, or appear before the court on May 19, 1999, for a contempt of court hearing. Judge Hunter did not comply with the order, and a show cause hearing was held in this matter on May 19, 1999. Judge Hunter eventually supplied the necessary transcript.
3. State v. Keine Johnson, CDC # 391-992. On July 31, 2000, and October 3, 2000, the Fourth Circuit ordered Judge Hunter to produce the transcript of a motion to quash hearing. Judge Hunter did not comply with the orders. On December 18, 2000, the Fourth Circuit ordered Judge Hunter to produce the transcript on or before January 18, 2001, or appear before the court on January 23, 2001, for a contempt of court hearing. On January 19, 2001, Judge Hunter complied with the Fourth Circuit's orders by filing the transcript with the Office of the Judicial Administrator for Orleans Parish Criminal District Court. The transcript was received by the Fourth Circuit on February 2, 2001.
4. State v. Darrin Brooks, CDC # 400-833. On March 7, 2001 and May 3, 2001, the Fourth Circuit ordered Judge Hunter to produce transcripts of closing arguments, jury instructions, and voir dire, or certificates of no objection, and various motion hearings. Judge Hunter did not comply with the orders. On June 14, 2001, the Fourth Circuit ordered Judge Hunter to produce the transcripts by August 10, 2001, or appear before the court on September 14, 2001, for a contempt of court hearing. On July 30, 2001, Judge Hunter complied with the Fourth Circuit's orders by filing all of the requested transcripts *348 with the Office of the Judicial Administrator for Orleans Parish Criminal District Court.
5. State v. Kenneth Hall, CDC # 387-335. On August 7, 2001, September 21, 2001, and October 24, 2001, the Fourth Circuit ordered Judge Hunter to produce the transcripts of the defendant's trial and sentencing hearing. Judge Hunter did not comply with the orders. On November 29, 2001, the Fourth Circuit ordered Judge Hunter to produce the transcripts on or before January 9, 2002, or appear before the court on January 17, 2002, for a contempt of court hearing. On January 14, 2002, Judge Hunter complied with the Fourth Circuit's orders by filing the transcripts with the Office of the Judicial Administrator for Orleans Parish Criminal District Court.
6. State v. Frank Moses, CDC # 397-504. On August 2, 2000 and October 3, 2000, the Fourth Circuit ordered Judge Hunter to produce the transcripts of the defendant's trial and sentencing hearing. Judge Hunter did not comply with the orders. On December 18, 2000, the Fourth Circuit ordered Judge Hunter to produce the trial transcript on or before January 17, 2001, or appear before the court on January 23, 2001, for a contempt of court hearing. Judge Hunter did not comply with the order, and following a hearing, she was held in contempt of court on January 24, 2001. On February 9, 2001, Judge Hunter complied with the Fourth Circuit's orders by filing the trial transcript with the Office of the Judicial Administrator for Orleans Parish Criminal District Court.
7. State v. Elgin McClay, CDC # 392-507. On October 19, 2001, and November 19, 2001, the Fourth Circuit ordered Judge Hunter to produce the transcript of the defendant's trial and sentencing hearing. Judge Hunter did not comply with the orders. On January 25, 2002, the Fourth Circuit ordered Judge Hunter to produce the transcript on or before March 4, 2002, or appear before the court on March 20, 2002, for a contempt of court hearing. On February 22, 2002, Judge Hunter complied with the Fourth Circuit's orders by filing the transcript with the Office of the Judicial Administrator for Orleans Parish Criminal District Court.
8. State v. Jennifer McKenzie, CDC # 405-596. On October 11, 2001, and November 29, 2001, the Fourth Circuit ordered Judge Hunter to produce the transcripts of the defendant's trial and sentencing hearing. Judge Hunter did not comply with the orders. On January 25, 2002, the Fourth Circuit ordered Judge Hunter to produce the transcripts on or before March 4, 2002, or appear before the court on March 20, 2002, for a contempt of court hearing. On February 26, 2002, Judge Hunter complied with the Fourth Circuit's orders by filing the transcripts with the Office of the Judicial Administrator for Orleans Parish Criminal District Court.
9. State v. Kick Hatcher, CDC # 419-293. On November 19, 2001 and January 23, 2002, the Fourth Circuit ordered Judge Hunter to produce the transcripts of the defendant's trial, sentencing hearing, and multiple bill hearing. Judge Hunter did not comply with the orders. On March 6, 2002, the Fourth Circuit ordered Judge Hunter to produce the transcripts on or before April 1, 2002, or appear before the court on April 10, 2002, for a contempt of court hearing. On March 28, 2002, Judge Hunter complied with the Fourth Circuit's orders by filing the transcripts with the Office of the Judicial Administrator for Orleans Parish Criminal District Court.
*349 10. State v. Robert Jenkins, CDC # 416-638. On November 19, 2001, and January 25, 2002, the Fourth Circuit ordered Judge Hunter to produce the transcript of the defendant's trial. Judge Hunter did not comply with the orders. On March 6, 2002, the Fourth Circuit ordered Judge Hunter to produce the transcript on or before April 1, 2002, or appear before the court on April 10, 2002, for a contempt of court hearing. On April 1, 2002, Judge Hunter complied with the Fourth Circuit's orders by filing the transcript with the Office of the Judicial Administrator for Orleans Parish Criminal District Court.
Subsection E of charge No. 0177 cites Judge Hunter's failure to perform her administrative duties by her consistent and persistent failure to cooperate with the Fourth Circuit:
1. State v. Kenneth Hall, CDC # 387-335. On February 5, 2002 and March 6, 2002, the Fourth Circuit ordered Judge Hunter to produce the transcripts of the defendant's trial and the court's ruling of December 22, 1998. As of the date the formal charge was filed against Judge Hunter, she had not produced the transcript of her ruling of December 22, 1998. For reasons that are not entirely clear, the trial transcripts were produced by the defendant's counsel.
2. State v. Ann Bernard, CDC # 407-589. On January 8, 2002 and February 19, 2002, the Fourth Circuit ordered Judge Hunter to produce the transcript reflecting the defendant's waiver of a jury trial. On March 20, 2002, Judge Hunter provided a certificate certifying that the transcript could not be produced. The certificate was received by the Fourth Circuit on March 22, 2002. However, on April 2, 2002, the transcript was delivered to the Office of the Judicial Administrator for Orleans Parish Criminal District Court. As of the date the formal charges were filed against Judge Hunter, this case was pending before the Fourth Circuit.
3. State v. Steve Banks and Jamar Rolling, CDC # 390-356. On March 9, 2000, April 26, 2000, and June 5, 2000, the Fourth Circuit ordered Judge Hunter to produce the transcript of the sentencing of Jamar Rolling. Judge Hunter eventually supplied the necessary transcript.
Subsection F of charge No. 0177 cites the extensive media coverage surrounding the administrative failures in Judge Hunter's court. The Commission alleged that the publicity caused members of the public to view negatively the judicial system in Orleans Parish Criminal District Court.
Subsection G of the charge relates to Judge Hunter's serving as her own minute clerk. The Commission alleges that during the period of time in which Judge Hunter performed the duties of the Section C minute clerk, the minute clerk's duties and responsibilities were performed in an inadequate and substandard manner.
Finally, in Subsection H of the charge, the Commission alleged that Judge Hunter's conduct violated Articles of the Louisiana Constitution of 1974, namely: La. Const. art. I, § 19 (granting to defendants the right to judicial review), and La. Const. art. V, § 25(C) (prohibiting a judge from engaging in willful misconduct relating to a judge's official duty, and from engaging in persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute). The Commission also alleged that Judge Hunter's conduct violated the Code of Judicial Conduct, namely: Canon 1 (a judge shall uphold the integrity and independence of the judiciary); Canon 2A (a judge shall respect and comply with the law and act in a manner that promotes public confidence in the integrity and impartiality *350 of the judiciary); Canon 3A(1) (a judge shall be faithful to the law and maintain professional competence in it); Canon 3B(1) (a judge shall diligently discharge her administrative responsibilities and maintain professional competence in judicial administration); and Canon 3B(2) (a judge shall require her staff to observe the standards of fidelity and diligence that apply to the judge).
JOHNSON J., Concurring.
We take no satisfaction from removing an elected official from public office. However, we must recognize that our responsibility as supervisors of Louisiana's judiciary is to ensure justice for victims of violent crimes and the witnesses who often times put their lives at risk when they come forward to testify in criminal trials. They are entitled to diligence and competence. The errors committed by this Judge have resulted in eleven reversals of criminal convictions by the appellate court, with some other cases filed and awaiting disposition that may also be reversed because of lost transcripts.
Judge Hunter concedes that as administrator of her Section of Court, she is ultimately responsible for the failure to produce transcripts. The record demonstrates a failure to respond to orders from the Court of Appeal, and a failure to ask for help from her colleagues at Criminal District Court, the appellate court judges or this Court when she first became aware of the problem and before we reached these disastrous consequences.
I write separately to express my view that the court reporters who recorded testimony and failed to produce transcripts of these trials share some responsibility for this debacle, and they should have their licenses revoked.
KNOLL, J., concurring.
While I am in full agreement with the result of the majority opinion removing Judge Hunter from office, I write separately because the majority opinion does not fully address the overwhelming evidence of other grave failures of Judge Hunter's conduct that are intolerable to the criminal justice system.
To the public and this court, Judge Hunter has persistently blamed others, primarily the court reporters, for her failures, while she admits her conduct caused these catastrophic consequences. Her accusations are unworthy of belief and fly in the face of the record evidence. There were 90 employees under her supervision between October of 1996 and March of 2002. This alone is phenomenal. While she alleges the court reporters lost the tapes of trials and hearings, Judge Hunter herself was responsible for many "lost" court records, which were later found in her disheveled office or courtroom. Although she was not officially charged with other administrative failures that she alone caused resulting in yet more grave consequences, this evidence certainly supports that she is incapable of administering justice in the criminal court.
In addition to the "lost" transcripts, there are many cases that "fell off the docket" because Judge Hunter would not sign the motion for an appeal. The deposition of the Supernumerary Judge pro tempore, Judge Winsberg, shows the cases that Judge Hunter would not act upon. While some of these defendants are out on bond, many are not and these defendants are serving time without being able to exercise their constitutional right to an appeal.
At oral argument, Judge Hunter was asked why she did not sign the motion for appeal in these cases and she responded by blaming the lawyers for not filing the *351 motions. The record evidence belies her response. Many of the motions were found languishing in her courtroom unsigned. In one instance an attorney attempted to file a written motion for appeal but Judge Hunter refused to accept it. This conduct is preposterous.
One of the most glaring injustices that demonstrates her wrongful conduct is the case of Richard Wright, who was kept in jail for a lengthy period on a probation warrant. Judge Winsberg explained that Judge Hunter was aware of Mr. Wright's incarceration, but failed to take any action in the case:
there are minute entries. She's continued to have the defense attorney do something that he can't do, and this fellow's been in jail on this probation hold. Now, he has been in jail so long,... that, had he gotten his two years, he'd probably be out on either good time or parole at this particular time. The judge indicated, `Well, we'll just let him sit, and when the two years are up he'll be released.' But the problem with that is that he's still on probation, in effect, because his probation has never been revoked. So he's just sitting back there.
Judge Winsberg's deposition contains other damaging and overwhelming evidence of many wrongdoings on Judge Hunter's part that should have been charged by the Commission, but apparently there was not enough time. While this conduct was not specifically formally charged, it serves to reinforce the general allegations of Judge Hunter's complete inability to administer her court.
Moreover, this evidence is important because in my view, it shows that Judge Hunter is not being candid with this court and the public when she persistently blames others for her failures. Her explanation is simply not true. These failures were caused by her conduct alone. It is disturbing that she has taken this position and yet requests a sanction less than removal.
This court does not lightly remove a judge from office. Since 1887, we have removed only seven judges from office. In my view, this case ranks as one of the most egregious. While Judge Hunter's apology to us for her administrative failures is appropriate, it does not diminish the travesty to the criminal justice system her conduct has caused. The consequences of her failures cannot be undone and are far too grave. Any sanction less than removal would put the criminal justice system at risk, as well as deprecate the seriousness of her conduct and the grave consequences to citizens of this state resulting from her conduct. She must be removed from office for the sake of the criminal justice system.
NOTES
[1] Six of these cases involved prosecutions where life sentences were imposed for murder or serious drug crimes following the first trial. However, since the reversals, one defendant was acquitted on retrial, another's case was dismissed, two cases resulted in sentences of twenty or forty years, and two cases remain pending.
[2] The March 19, 2002 order appointed Judge Winsberg to serve as Supernumerary Judge pro tempore through May 19, 2002. By order dated April 2, 2002, Judge Winsberg's authority was expanded to include certain specified duties and functions. Subsequent orders have granted further extensions of this appointment through August 21, 2002. In addition, this court appointed retired Judge Robert J. Klees as Judge pro tempore of Section C effective July 1, 2002, through December 31, 2002.
[3] The record contains copies of numerous articles and editorials from the newspapers in New Orleans and Baton Rouge, and a tape of a television broadcast from WWL-TV in New Orleans, concerning the transcript problems that plagued Judge Hunter, as well as the appointment of Judge Winsberg. We reference this portion of the record only for the sake of indicating the notoriety of Judge Hunter's failures.
[4] At the commencement of the hearing, Judge Hunter through her counsel stated:

Judge Hunter acknowledges and admits that the conduct that she had been accused of is correctly charged against her. She acknowledges that she had failed to adequately supervise and manage employees on her staff. She admits that she has failed to produce transcripts which has resulted in reversals [in] many of them by the Fourth Circuit.
She admits that on occasion that she had failed to produce[] transcripts even if it did not result in dismissal or reversals. She acknowledges that the Fourth Circuit has had to order her and threaten her with contempt in order to do things. And not only does she acknowledge that those facts occurred, she acknowledges that the fault lies with her in being unable to comply with orders of the Fourth Circuit.
She acknowledges that on occasion she and her office have not cooperated with the Fourth Circuit, which is basically an allegation that the Fourth Circuit has asked her to do things and ordered her to do things, but without the threat of contempt.
She acknowledges and she regrets that her administrative and management failures have caused the public to have a negative view of Section C, her court, and it could cause a bad view of the court system in general.
And she acknowledges that her decision to act as her own minute clerk resulted in far less than adequate minute entries, and that that was a decision that she made that she should not have made. She should not have acted as her own minute clerk.
Judge Hunter in her testimony before the Commission agreed with her counsel's statement admitting the allegations set forth in Charge No. 0177. Furthermore, she specifically admitted: (1) that she failed to supervise and manage the staff of section C; (2) that she was responsible for the reversals of eleven cases by the Fourth Circuit and that her conduct in connection with these reversals violated the Code of Judicial Conduct; and (3) that she was responsible for the conduct resulting in the numerous orders from the Fourth Circuit, including orders threatening to hold her in contempt, and that her conduct resulting in these orders violated the Code of Judicial Conduct. Judge Hunter also admitted that her actions in failing to provide transcripts resulting in eleven reversals has caused the judicial system and her court in particular to be held in disrepute and to be damaged in the eyes of the community. She stated that it was not her intent to bring the court into disrepute, stating:
I was really trying to solve the problem. I was putting in place mechanisms and thinking that there was some movement towards improvement. But, the sum total of it is it didn't get done. And if it didn't get done and I was responsible and I am responsible for getting it done, then the failure lies with me. You know, that'sI'm not going to say it's hard. I'm going to say that the problem was one that we were making efforts to deal with. But, the end result, again, if it didn't get done, was that there was a failure to do so, and that failure lies with me.
[5] A twelfth case, in which the defendant was convicted of second degree murder, was initially reversed by the court of appeal, which could not determine whether the omission from the jury charge of the elements of the crime was due either to legal error on the part of the trial judge or to a gap in the trial transcript. State v. Boatner, 01-1659 (La. App. 4 Cir. 6/26/02), 2002 WL 1434178. The portion of the transcript containing the jury charge had not been certified by the court reporter. At some point after the appellate court's decision was handed down, the tape containing the jury charge was discovered. After reviewing the newly-produced transcript and finding no error in the jury charge, the court reinstated the defendant's conviction and sentence. State v. Boatner, 01 1659 (La. App. 4 Cir. 8/14/02), ___ So.2d ___, 2002 WL 1938617.
[6] The respondent stipulated to the accuracy of the statements given by the responsible assistant district attorneys regarding the history of these cases on remand from the court of appeal.
[7] Since October 1996, when she first took the bench, Judge Hunter has had forty-four full-time employees in five positions. This number far exceeds the number for any other Section of Orleans Parish Criminal District Court.
[8] During the summer of 2001, several court reporters made substantial progress in putting in order all the court reporter tapes that were stored in an upstairs storage area at the court (as opposed to the Section's file storage area located across the street in a U-Haul facility, which was described as very disorganized). As a result of the organization, Judge Hunter believes that any tapes required to be transcribed by the Fourth Circuit beginning with trials conducted in 2001 and thereafter will be obtainable. However, Judge Hunter remains unsure about transcripts that may be needed for earlier dates because, after the organization, it became apparent that some tapes are missing.
[9] Only on recommendation of the Judiciary Commission, a constitutionally-created body pursuant to La. Const. art. V, § 25, may this court censure, suspend with or without salary, remove from office, or retire involuntarily a judge for:

willful misconduct relating to his official duty, willful and persistent failure to perform his duty, persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute, conduct while in office which would constitute a felony, or conviction of a felony.
La. Const. art. V, § 25(C).
[10] As discussed below, Judge Hunter's conduct was not only grossly negligent in failing to administer her court, but she knowingly and intentionally failed to comply with the directives of the court of appeal and, thus, willfully and persistently failed to cooperate with that court in the administration of the court.
[11] For example, in State v. Whiticar and State v. Vance, the respondent, pursuant to a show cause order, certified that tapes of the trial transcript and sentencing transcript, respectively, could not be located. Those cases are pending before the Fourth Circuit. Also pending appeal are State v. Hall and State v. Bernard, in which tapes of the transcript of a ruling and the trial transcript, respectively, cannot be located.
[12] Rule XXIII, § 26 provides:

Any former judge who has been removed from office by the Supreme Court pursuant to La. Const. Art. V, § 25(C) is not eligible to become a candidate for judicial office until certified by this court. After five years from the date of removal, a former judge may file a petition for reinstatement of eligibility to seek judicial office with the judiciary commission. The commission shall promptly review the petition and may hold a hearing and take evidence if necessary. Within thirty days of the filing of the petition, the commission shall file a written recommendation with this court as to whether the former judge's eligibility to seek judicial office should be reinstated. The court shall review the recommendation of the commission and issue an order granting or denying the former judge certification of eligibility to seek judicial office.
[1] Defendants have sought review of the Fourth Circuit's ruling in this court, and the matter is currently pending under docket number 2001-K-3103.
[2] Defendant has sought review of the Fourth Circuit's ruling in this court, and the matter is currently pending under docket number 2002-K-1395.
[3] The Fourth Circuit has since vacated the defendant's conviction and sentence, citing the absence of the trial transcript, and it remanded the case for a new trial. State v. Harris, 01-1910 (La.App. 4th Cir.4/24/02), 817 So.2d 1164.
[4] The Fourth Circuit vacated the defendant's conviction and sentence, State v. Boatner, 01-1659 (La.App. 4 Cir. 6/26/02), but later, when the tape of the jury charge was found, reinstated the conviction and sentence and affirmed. 01-1659 (La.App. 4 Cir. 8/14/02), ___ So.2d ___, 2002 WL 1938617.