JANVIER, Judge.
This suit arose out of an automobile collision which occurred February 5, 1964 in which Plaintiff’s vehicle was struck in the rear by a vehicle operated by Defendant’s insured. Because liability has been admitted, the only issue here, as it was in the lower court, is quantum. The trial judge awarded Plaintiff $22,410.52, the net after deducting from the $25,000 policy limits the amount of wages and medical expenses paid by Royal Exchange Assurance Co., the compensation insurer of Plaintiff’s employer. In his reasons for judgment, the trial judge stated he would have awarded a greater amount had the policy limits been higher.
Defendant appealed asking for a reduction of the award to $6,000 contending the trial judge abused his discretion, the award being especially excessive because Plaintiff, by his own admission, suffered only minimal pain as a result of his injuries. The only witnesses were Plaintiff and Dr. John Kenneth Saer, an orthopedic surgeon, who treated Plaintiff from February 10, 1964, five days after the accident, until May 27, 1966, nearly two and a half years later. In oral argument Defendant acknowledged the credibility of both witnesses and does not challenge the following medical history given by them.
Dr. Saer diagnosed Plaintiff’s injury as a severe one to the ligaments and disc at C-5, C-6 (vertebrae) level of the neck which also caused Plaintiff weakness in his right arm. Plaintiff, a traveling salesman dealing in machinery, was unable to work for six weeks after the accident. When he did return to work, he had to wear a cervical collar whenever he drove an automobile, his job requiring him to drive approximately 800 miles a week. In spite of his wearing the cervical collar, he began to experience pain in his neck which at first occurred only once or twice a week, but on November 30, 1964 while walking up the stairs in a motel in Mobile, Alabama, Plaintiff suffered an onslaught of pain which did not subside and steadily became more severe until he underwent an operation on March 12, 1965. From November 30, 1964 until his operation, he could only work from one-half to three-quarters of his usual daily schedule and sometimes had to stop on the road at motels in order to rest. Finally in March, 1965, his condition became so severe Dr. Saer decided an operation would be advisable. Prior to that time, treatment was “conservative,” consisting of drugs, massage, the wearing of a cervical collar, and cervical traction treatment at home.
The operation performed March 12, 1965 consisted of cutting through the C-5, C-6 and C-7 vertebrae and removing the inter-vertebral discs between C-5 and C-6 and between C-6 and C-7. Simultaneously a bone graft was taken from Plaintiff’s hip and placed as a solid wedge in the cut made into the three vertebrae so as to fuse them, with bone chips also being taken from the-. *459 hip and put in place of the two cervical discs which had been removed.
After the operation, Plaintiff was in the hospital in traction for two weeks, in bed at home for six weeks, had to wear a cervical collar day and night for more than three months, and was unable to work for seventeen weeks.
Plaintiff, who was 34 at the time of the accident, now has a 50% loss of motion of the neck in all directions; a numbness in the thumb and index finger of his right hand which makes it difficult for him to pick up thin objects such as paper; suffers aching in the neck area after he drives more than an hour, his job now requiring him to drive between 500 and 800 miles a week. Plaintiff, as part of his job, must inspect machinery which involves assuming awkward neck positions which will probably be painful to him. These disabilities according to Dr. Saer, are permanent and Plaintiff, in his opinion, has a present 20% to 25% disability of the entire body. In addition, in Dr. Saer’s opinion, Plaintiff is more susceptible to degenerative changes in other joints and to injuries to the neck.
Moreover, prior to the accident, Plaintiff played both tennis and golf. Although Dr. Saer testified Plaintiff could try to play golf, Plaintiff testified that he had not engaged in this sport since the accident. Dr. Saer testified Plaintiff should not attempt to play tennis at all. When asked why this was so, he testified as follows:
“He always had pain when he looked up. He had marked pain on extension of the neck. In fact, one time in the office when I first saw him I tried to get him to look up and he became dizzy and almost fell. He still has trouble looking up and I think in tennis in volleying and in serving it wouldn’t be feasible and it would require him to move and turn his neck.”
Defendant concedes Plaintiff suffered a severe neck injury, that he was operated on in the involved area and has a residual loss of motion in the neck of 50%. In fact, as stated above, it concedes the truthfulness of Plaintiff’s and Dr. Saer’s testimony but contends Plaintiff’s own testimony proves that his symptoms and suffering were not great over an extended period, relying heavily on the following testimony:
“Q. Could you tell the Court or describe to the Court the extent of the pain which you had say in the first six weeks that you were home following the accident?
“A. Well it was not really pain you could put your finger on; it was more of an annoying thing at the time than anything else. It was a question of getting — I would say a strain to determine it more than anything else, like if you pick up something heavy you have to put it down, you don’t have real pain. You can feel it in your muscles, that is probably the feeling more anything else.”
Plowever, it must be pointed out that this testimony was in reference to Plaintiff’s symptoms during the first six weeks after the accident. His testimony regarding the year in which he worked before the operation, and especially after November 30, 1964, as well as that concerning his postoperative pain, is of an entirely different character.
After he resumed work, six weeks after the accident, Plaintiff testified his neck gradually “got to bothering me all of the time and the later in the day it got, the more it ached.” After November 30, 1964, he experienced pain every day which he described as follows:
“I had constant pain just like someone taking a bunch of pins and sticking them in you. It was all the time hurting; it wasn’t knife-like pain; I’d say it was something you could live with. You could never get rid of it and actually I thought the day would never come to *460 an end and I just couldn’t do anything about it.”
Defendant relies on the statement, “I’d say it was something you could live with,” to prove the pain was minimal. However, when taken in the context of the above answer and his other testimony, the mere statement that he could live with the pain does not support the conclusion that the pain was not considerable and constant. For example, Plaintiff described his condition thus:
“Q. And was that pain constant?
“A. It was constant. It was all the time. I would even wake up at night with it and that’s the thing that really worried me because I was always up to this thing more or less and it would gradually build up and at that time I was at least able to get some relief after lying down a half hour or so. It was only on occasions that I had trouble at night but from that point on I had trouble all night and all day.”
“From that point on” obviously refers to the time from November 30, 1964 when Plaintiff testified the pain became constant.
With regard to his state of mind before the operation, Plaintiff testified as follows:
“Truthfully, I kept getting worse and worse and felt it was having some effect on my state of mind. I’d come home in the evening and have this pain and be annoyed and I was not easy to live with.”
In addition, Dr. Saer described Plaintiff as a very good patient and a “solid” type of individual who did not complain of a lot of pain. However, he characterized Plaintiff’s injury as very painful and disabling.
With regard to his post-operative pain, Plaintiff testified as follows:
“Q. Do you recall at this time [after the operation] if any part of your body was painful?
“A. Oh yes, I had quite a bit of pain in my arm, shoulder and my back.
‡ 5|; ¡js ‡
“Q. What about the hip where they took the bone graft from?
“A. Well it was pretty painful. It was pretty hard to walk.
“Q. Plow long did the pain or difficulty in walking from the cutting out of the bone in the hip last?
“A. Oh I’d say about 7 months, I still have a hard time getting out of a chair every now and then.”
Therefore the record does not support Defendant’s principal contention that Plaintiff’s pain was not severe.
It is well established that, with regard to quantum, each case must be decided largely on the facts and circumstances surrounding the particular injury involved and that amounts of awards in similar cases are relevant for the exclusive purpose of determining whether the award is so excessive or inadequate as to constitute an abuse of the great discretion vested in the trial court. Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149; Ballard v. National Indemnity Company of Omaha, Neb., 246 La. 963, 169 So.2d 64.
In the instant case considering both the facts and circumstances of the case and the jurisprudence, we do not feel that the trial judge abused his discretion.
Plere Plaintiff suffered a severe neck injury, underwent an operation which will adversely affect both his employment and recreational activities. There are the added factors that he could not work for almost half a year, seventeen weeks of which were after his operation; that during the period he was working, he had to wear a' cervical collar while driving 800 miles per week, *461 •during which time his painful condition was steadily worsening; that he had a long post-operative period in which he was in traction for two weeks, wore a cervical collar for three months, night and day; and that the fact that he has lost 50% of the motion of his neck in all ranges will be a source of particular difficulty to him because of the peculiar nature of his job. Moreover, he is vulnerable to future degenerative changes and to trauma. Under the circumstances, the award is sufficiently in line with the jurisprudence so as not to •constitute an abuse of discretion. Gaspard v. LeMaire, supra; Sensat v. Travelers Indemnity Company, La.App., 166 So.2d 316; Matthews v. F. Miller & Sons, Inc., La.App., 146 So.2d 522; Hidalgo v. Dupuy, La.App., 122 So.2d 639.
With regard to special damages the following were stipulated as due by Defendant if judgment were rendered against it:
$2,823.10 to Royal Exchange Assurance Co. — $1,763.68 for medical expenses and $830 for wage compensation payments both paid as Plaintiff’s employer’s compensation insurer; plus $229.42 ■expense incurred as the carrier of Plaintiff’s employer’s automobile insurance.
'$100.00 to C. T. Patterson Co., Inc., Plaintiff’s employer, being the amount of the $100 deductible expense incurred when its vehicle was damaged.
Plowever, Royal Exchange Assurance Co. points out a minor clerical error made in the judgment in its behalf. Instead of the stipulated $1,763.68 medical payments, the •court apparently awarded $1,759.68. Therefore the judgment in favor of Royal Exchange Assurance Co. is increased to $2,823.10. Because this increase includes •compensation payments which total $2,593.-68, this is deducted from the $25,000 policy limits and the judgment in favor •of Plaintiff is reduced to $22,406.32.
As amended, the judgment is otherwise affirmed; Defendant to pay all costs in both courts.
Judgment amended and affirmed.