JANVIER, Judge.
This matter came before us on a previous occasion on an exception of no cause of action filed by the mother of a minor who had not qualified as tutrix and, who, therefore, contended that she could not be sued. The exception was maintained in the District Court and, on appeal, we reversed that judgment and remanded the matter to the District Court for trial on the merits. 187 So.2d 540.
Plaintiff, Frank J. Tripoli, age 34 years at the time, sustained physical injuries on Sunday, April 26, 1964, at the climax of an altercation with Jack Gurry, a young man 17 years old, which altercation commenced in one of the branches of a large drugstore chain in New Orleans in which Tripoli was pharmacist and, at the time of the occurrence, assistant manager.
Charging that the injuries had resulted from the altercation and that young Gurry was the aggressor, Tripoli brought this suit against the mother of the young boy and against Lumbermens Mutual Casualty Company, the mother’s liability insurance carrier.
Aetna Casualty and Surety Company, the compensation insurer of the employer of Tripoli, intervened, seeking to recover the amount it, as compensation insurer, had paid to the employer or which Tripoli had received or was liable for.
Plaintiff alleged that, as a result of the attack by young Gurry, he had sustained serious physical injuries, including the breaking of both bones in his leg, and he prayed for judgment in the sum of $69,-375.07.
Defendant Lumbermens Mutual Casualty Company denied liability averring that Tripoli had been the aggressor and that, accordingly, there was no liability in it and it especially denied that the breaking of Tripoli’s leg had resulted from anything done by young Gurry.
The District Judge held the defendants, Jack Gurry, Mrs. Lula Mae Bankston Gur-ry and Lumbermens Mutual Casualty Company liable, in solido, stating that he felt that young Gurry had been the aggressor and he rendered judgment in favor of Tripoli in the sum of $1500.00 against said defendants. He felt that the breaking of Tripoli’s leg had not been caused by Gur-ry’s aggression and accordingly that plaintiff himself should pay the medical expenses associated with that injury and also all medical and expert fees of doctors who testified as to the seriousness of the breaks in the leg and the results thereof.
Plaintiff appealed devolutively, contending that the amount awarded is inadequate and that he also should be allowed medical expenses and experts’ fees.
The intervention of Aetna Casualty and Surety Company, the compensation insurer of the employer, was dismissed on the ground that compensation and medical payments had been paid for injuries to Tripoli’s leg which had occurred before the assault by Gurry. The intervenor has appealed suspensively and all defendants have appealed suspensively and devolutively.
*165 There is no dispute as to the early stages of the altercation. Young Gurry had spent the day with his friend, Marcel Bourcq, who was about the same age; that admittedly they had been drinking (Gurry says he drank two or three glasses of wine) earlier in the evening at Gurry’s home. While this has little bearing on the final controversy, we feel that it should be mentioned.
Gurry says that at about 7:30 in the evening, he and Bourcq went to the drugstore in which Tripoli was employed. At the drink and lunch counter they met three other young friends, and, after a short time, began to engage in loud talking and boisterous behavior and admittedly used most vile and obscene language. The attention of Tripoli was attracted, and he went to the boys and warned them that they must discontinue such behavior. The other boys seem to have complied with the warning to some extent, but when young Gurry continued in this objectionable conduct and language, Tripoli told him that he must leave the establishment. He protested and said that he had ordered something to eat and that he would not go until he could be served. Tripoli cancelled the order and insisted that Gurry leave, and, as Gurry walked to the door to make his exit, Tripoli followed him, stating that he desired to get the license number of Gurry’s car as he had summoned the police and was afraid that Gurry might leave before their arrival. Gurry laughed and mocked him, saying that he had no car, which was true. Gurry walked a few feet away from the establishment, remaining in the parking area, and Tripoli followed him, saying that Gurry must remain as the police had been summoned. At sometime during the controversy Tripoli exhibited a badge of some sort which he said was a Sheriff’s badge, apparently using this to persuade Gurry to remain. As a matter of fact, he admits that he was not a sheriff and had no official authority except as manager of' the store.
Gurry then went a few feet further from the establishment, and, as Tripoli insisted he must wait, Tripoli says that Gurry turned and clenched his fists and suggested that they fight the matter out there. This occurred at least once more before the final unfortunate result.
As to the third occurrence, there is much dispute and we think that the determination of the question of who was the aggressor must depend on our interpretation of the evidence concerning the occurrences at the last of the'three confrontations after the two left the store itself. However, we feel that in determining the aggressor we must to some extent take into consideration other evidence which might make it seem more probable that one was the aggressor and not the other.
The fact that Gurry had been drinking wine earlier plays little part as there is nothing to indicate that the wine had any great effect on him. However, it should not be entirely overlooked. Then, too, while Tripoli was 34 years of age and young Gurry was only 17, Gurry himself seems to have been very proud of his physical prowess. He says that he “had fifteen amateur fights” and won twelve. From these several indications which seem to point slightly to the probability that Gurry was the aggressor in that last encounter and from the testimony of several witnesses, we conclude that the District Judge was not manifestly in error in reaching the conclusion that the fault for the terminal occurrence lay with young Gurry and that, accordingly, he, his mother and the insurer should be held liable for such injuries as were actually caused by the aggression of the young man.
We shall discuss the evidence which leads to this conclusion when we come to a consideration of the question of whether the breaking of plaintiff’s leg resulted from an assault by Gurry or was caused by the fault of Tripoli before he was assaulted.
*166 The superficial injury, a cut on Tripoli’s face, was obviously the result of the physical beating administered by Gurry, but the District Judge reached the conclusion that the breaking of the leg had not been caused by the assault, but resulted solely from the fall of Tripoli to the pavement before he was struck by the boy.
We have found it difficult to accept the view that Tripoli fell without an attack by the boy. It is true that Gurry says that Tripoli attempted to grab him and that when he pulled away, Tripoli fell and it was this fall which broke his leg.
The evidence, we think, justifies a completely different conclusion.
We, therefore, quote from the various witnesses. Gurry himself said: “I told him if he didn’t get his hands off me I was going to knock them off.” He was asked: “Did he take his hands off” ? and he answered: “No, he didn’t, so I knocked them off.” He further said: “Mr. Tripoli attacked me and I moved out the way, he fell down and broke his leg. That’s how I suppose it got broke.”
Marcel Bourcq, his friend, says that Tripoli was “grabbing Jack trying to hold him there to wait for the police, holding, grabbing him by the arm and grabbing him around the waist,” and that “Jack just kept pulling away, kept walking.” He says that Tripoli lunged forward at Gurry and that “Jack moved out the way,” and he, Tripoli, “fell down” and that when he did, “Jack hit him,” and “I told Jack not to hit him any more.”
Kerry L. Hosch, one of the young men who had been with Gurry in the drugstore, says that Gurry did not knock Tripoli down; that it “looked like the manager was either pushing or trying to pull Jack Gurry and he fell; he went down.”
Mary Lumpkin, an employee in the drugstore, says that she looked through one of the windows and saw Tripoli lying down on his back; the young man was standing over him; “one was twisting his leg, it looked like he was twisting his leg, holding his leg.” This obviously was Gurry.
Beverly Glenn, another employee in the drugstore, says that she saw Tripoli “when he went down and the boy was punching him and kicking him.” She says that Tripoli was “protecting his face, but he did not hit the boy,” and when asked what Gurry was doing, she said: “He was stomping him and he was kicking him and punching him, you know, like that, on the ground. He had his knee into the side of him on the ground.”
Mrs. Claire Gullo, who drove up to the parking lot while the affray was in progress, says that when she first saw Tripoli “he was down on the ground, he wasn’t doing anything, he couldn’t defend himself the way he was being beat.” When asked what Gurry was doing, she said: “He was straddling over Mr. Tripoli and beating him and calling him all kinds of names and cursing him.” She was asked how many times Gurry hit Tripoli and she replied: “He never did stop, as far as I was concerned.”
The suggestion made by the defendants that after Tripoli’s leg was broken and he fell to the ground, he wrestled and grappled with Gurry is difficult to accept, particularly as the doctor who saw him very shortly after the occurrence says that after such a displaced fracture as Tripoli sustained “he would be unable to do anything physically.”
From all this evidence, we reach the conclusion that, although Tripoli did what he could to persuade young Gurry to wait for the police, he did not attack him physically, though in all probability his insistence incited Gurry to the extent that on the last' of the three occasions he turned and struck Tripoli, knocking him to the ground and then inflicted the serious injuries on which the claim of Tripoli is based.
Even if Tripoli attempted to physically restrain Gurry and to prevent his leaving, *167 which he had no right to do, and the evidence on behalf of defendants does no more than show an attempt to grab and hold Gurry, this would not have justified the attack which we think knocked Tripoli to the ground, after which he was unable to do anything physically. It certainly would not justify the vicious beating and stamping and twisting of the leg, which we think caused the displaced fractures of both bones, with the foot turned out, the bone separated as described by Dr. Saer.
While this particular question of how far one may go in defending himself against the assault was not especially at issue, in Muller v. Zimmer, La.App., 155 So.2d 470, we repeat what we stated in that case:
“Our jurisprudence is well settled to the effect that an aggressor is precluded from recovering damages which he incurs as the result of his own actions in provoking an altercation. However, it has also recognized that the original aggressor may recover if the person attacked has used excessive force in defending himself.
“Our jurisprudence further imposes a duty upon the person assaulted to retire from the affray if an opportunity presents itself, and his failure to do so constitutes a counter-aggression. This is so because he has not availed himself of the opportunity to end the altercation by a lawful means.”
In Bauman v. Heausler, La.App., 188 So.2d 189, we found a situation which resembles that presented here. There we said:
“While we have rejected the defense of justification for the reasons stated above, even if we were to assume that defendant might have thought his child to be in danger of being harmed by plaintiff, we would still hold him liable, because he went beyond the defense of the child and willfully assaulted plaintiff when he was prostrate and unconscious and no longer a threat to him or his child. Excessive force as a defensive measure is not justified. It was this excessive force — the kicking of his unconscious victim — which caused the most serious injuries to plaintiff. Oakes v. H. Weil Baking Co., 174 La. 770, 141 So. 456 (1932); Smith v. Foucha, 172 So.2d 318 (La.App. 4th Cir.1965); Rivers v. Brown, supra, La.App., 168 So.2d 400; Bethley v. Cochrane, supra, La.App., 77 So.2d 228.”
We shall now consider and discuss the extent of plaintiff’s injuries.
Dr. John Kenneth Saer, admittedly an orthopedic expert, testified that he had examined Tripoli on the day of the occurrence. He found an “obvious fracture of his left leg”; and that X-rays which were taken “showed fractures of the distal tibia and fibula, both bones of the leg. * * * a few inches above the ankle joint * * ”
The day following admission to the hospital, the fractures were fixed operatively which required the insertion of screws. The leg was placed in a cast following the operation. Tripoli was discharged from the hospital about three weeks later and was required to use crutches. His leg remained in a cast for two and a half months and was then placed in a “walking cast” so that he could “bear weight” on his foot. On August 24, 1964, which was almost four months after the accident, the cast was removed and he was permitted to gradually bear weight provided he did so with crutches. In November, 1964, his progress was “reasonably good.” He had complaints of soreness. It was thought that possibly the soreness and discomfort had resulted from the screws, though the doctor did not know whether that soreness resulted “from foreign body reaction.” He said it was not unusual following a major fracture to have pain and discomfort for more than nine months. The removal of the screws in May, 1965, required general anesthesia. Dr. Saer was asked about his condition when he saw him last on June *168 25, 1965. He said that “his fracture was healed and in normal position.” He found no evidence of back pain. It was suggested that possibly Tripoli had developed phlebitis as a result of the fractures and the operation. Dr. Saer said: “I never thought that he had phlebitis”; but added that phlebitis might be a residual from such a fracture. As to Tripoli’s complaint that a condition known as “causalgia” had developed in the fracture area, Dr. Saer said: “I do not think that this was causal-gia.”
Tripoli had been in an automobile accident on June 16, 1964, and Dr. Saer was asked whether he thought that that accident might have injured the already damaged leg, and he said: “I did not think he had done any damage to the leg, at that time.” On November 8, 1964, Dr. Saer released Tripoli as able to return to work. He says that he may have told Tripoli that he could go back to work sooner if he felt capable of doing so, and Tripoli did in fact go back to work for Katz & Besthoff on September 5, 1964.
Dr. Davis W. Aiken, admittedly an expert in general surgery, examined plaintiff on March 6, 1967. He obtained a history showing the fracture of the two bones in the leg and the treatment, including the fixation with metal screws and the removal of the screws. He found that Tripoli was continuing to have swelling and pain in the leg, which was aggravated after two or three hours of standing at work as a pharmacist. He said that Tripoli could not wear an elastic stocking which had been prescribed as he felt that it presented a hazard to circulation. Dr. Aiken, referring to back pain, said that it had not been evaluated by him. He found considerable difficulty in the use of the leg, saying that “there is a sensation of restriction of motion in the anterior and posterior muscles and tendons in the region of the fracture”; that dorsaflexion of the left foot was accomplished to about ten degrees less than dorsaflexion of the right foot, and that the same was true of planterflexion, both of which we understand mean mobilization of the ankle. He found fungus infection of the great toenail, but said that Tripoli said that this had been present for many years. We think that the chronic throm-bophlebitis of the leg, which apparently developed in the calf of the leg, seems to have been the result of an inherited condition of weakness which the record shows plainly that Tripoli had suffered from long before he was injured in the assault.
Tripoli, in July, 1965, went to California to seek employment. While there he was examined by Dr. Anthony J. Flood, an expert in the field of thoracic and cardiovascular surgery. He received a full history of the cause of the breaking of the leg and the treatment thereof. Dr. Flood found that Tripoli suffered considerably when he stood for long hours and suggested various possibilities which may have caused this, but as we read his testimony in full, we reach the conclusion that Dr. Flood thought that his continuing pain and possibly the pain in the back of which he complained might have resulted from a foot condition which is probably hereditary in nature. He felt that Tripoli should consult a podiatrist, which he did, since the condition existed in both feet which would indicate the probability that that condition had not been caused or aggravated by the assault.
Tripoli also saw Dr. Neis W. Ahnlund, an expert in orthopedic surgery, in California, on September 30, 1965, and he found the same condition as to the flexion of the ankle of the left foot and said that his impression at that time was that “he probably had a residual superficial thrombosis of the saphenous vein over the left lower tibia and probably a deep vein thrombosis over this area. Dr. Ahnlund felt that while plaintiff’s condition would never become completely normal, he had improved considerably, but said that after three years “there had been no consistent improvement” and that between his first ex *169 amination in September, 1965 and his examination in January, 1967, which was approximately fifteen months, the residuals consisted of limited motion in the ankle joint. He complained of causalgia in the operative area and scar. Dr. Ahnlund defined this condition as a state in which there is complaint of pain without evidence of nerve root irritation and out of proportion to the amount of findings that one would necessarily find. The doctor could discover no reason for the back pain of which Tripoli complained except that it might be the result of his limping and attempting to favor the left leg.
Considering the seriousness of plaintiff’s injuries and the fact that they will partially disable him for several years, a total award of $10,000.00 is neither excessive nor inadequate. We have taken into consideration his several claims; first, he is entitled to an additional special award of $607.50, which would represent the difference between the compensation which he received from his employer and the amount he would have earned had he not been disabled. We think this amount and any other claim for lost wages should form a part of his total award and not be added to it.
Tripoli claims experts’ fees for each of the several doctors who testified, but we find that they all gave evidence as to the treatment they gave to Tripoli.
We have not overlooked the warning which the Supreme Court gave in Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149, when, on rehearing, the Supreme Court, referring to the question of whether or not awards in other cases should be used to determine the amount to be awarded in particular cases under consideration, it said that while in a case cited there might be a “similar injury * * * the similarity ceases for each case is different, and the adequacy or inadequacy of the award should be determined by the facts and circumstances peculiar to the case under consideration.” In Simpson v. Alexander, La.App., 195 So.2d 457, we said:
“It is well established that, with regard to quantum, each case must be decided largely on the facts and circumstances surrounding the particular injury involved and that amounts of awards in similar cases are relevant for the exclusive purpose of determining whether the award is so excessive or inadequate as to constitute an abuse of the great discretion vested in the trial court. Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149; Ballard v. National Indemnity Company of Omaha, Neb., 246 La. 963, 169 So.2d 64.”
Bearing this principle in mind we have given study to other cases solely for the purpose of determining whether the injuries in those other cases are similar.
In Winn v. Yellow Cab Company of Shreveport, La.App., 96 So.2d 365 we find a case which appears to us to be quite similar and in which an award of $6,000.00 was increased to $10,000.00 by the Court of Appeal, Second Circuit, which was not disapproved by the Supreme Court.
In Cormier v. Traders & General Insurance Company, La.App., 159 So.2d 746, the Court of Appeal for the Third Circuit raised an award of $5,000.00 to $10,000.00 to a 19-year old married woman whose injuries consisted of compound comminuted fracture of tibia and fibula of left leg, dislocated left thumb, multiple fractures of index finger of left hand, periosteal disruption of clavicle and subsequent hemorrhage and calcification of that area and general contusions and abrasions. The Supreme Court, after granting a writ (246 La. 976, 169 So.2d 69), held that for these injuries the award of $10,000.00 was excessive and should be reduced to $5,000.00. When we consider the injuries in that case and compare them to the injuries sustained here, we feel that an award of $10,000.00 is not excessive.
*170 We find it stipulated that interven- or, Aetna Casualty and Surety Company, paid the medical expenses which amounted to $2549.67 and compensation for a period from April 27, 1964, through October 5, 1964, which amounted to $840.00, or a total of $3389.67. In accordance with the provisions of R.S. 23:1101, 23:1102, 23:1103, and 23:1162 any award which is made must, up to that amount, be assessed in favor of the employer and credit for that amount be given to Aetna Casualty and Surety Company, in reduction of the amount which may ultimately be due in compensation by the said insurer.
For the reasons assigned, insofar as the judgment appealed from dismissed the intervention of Aetna Casualty and Surety Company, it is annulled, avoided and reversed and there is now judgment in favor of intervenor, Aetna Casualty and Surety Company, and against defendants, Jack Gurry, Lula Mae Bankston Gurry and Lumbermens Mutual Casualty Company, in solido, in the sum of $3389.67 with interest from judicial demand, to be credited to any amount for which said insurer may be liable in compensation; the judgment appealed from is amended by the increase of the amount awarded to plaintiff, Frank J. Tripoli, to $6610.33, with interest from judicial demand, in all other respects the judgment appealed from is affirmed. Costs in both courts are to be paid by defendants.
Reversed in part. Amended and affirmed.