# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE                    NEWS RELEASE #054

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **11th day of December, 2025** are as follows:

**BY Weimer, C.J.:**

2025-O-01127          IN RE: JUDGE TIFFANY FOXWORTH-ROBERTS

REMOVAL FROM JUDICIAL OFFICE ORDERED. SEE OPINION.

Hughes, J., dissents for the reasons assigned by Justice Griffin.
Crain, J., concurs for the reasons assigned by Justice McCallum.
McCallum, J., additionally concurs and assigns reasons.
Griffin, J., dissents and assigns reasons.
Guidry, J., dissents and assigns reasons.
Cole, J., additionally concurs for the reasons assigned by Justice McCallum.

# SUPREME COURT OF LOUISIANA

## No. 2025-O-01127

## IN RE: JUDGE TIFFANY FOXWORTH-ROBERTS

*Judiciary Commission of Louisiana*

**WEIMER, C.J.**

This matter arises from the recommendation of the Judiciary Commission of Louisiana (Commission) that Judge Tiffany Foxworth-Roberts be removed from office for making false and misleading statements regarding her judicial campaigns; making false and misleading statements to police investigating the reported burglary of her car; and withholding information and providing false, incomplete, or misleading information during the investigation by the Office of Special Counsel (OSC), as well as in the proceedings before the Commission. After considering the facts, circumstances, and applicable law, this court adopts the recommendation of the Commission.

## FACTS AND PROCEDURAL HISTORY

On August 15, 2020, Judge Tiffany Foxworth-Roberts (Respondent) became a judge on the Nineteenth Judicial District Court, Division "M," Parish of East Baton Rouge, State of Louisiana. On November 3, 2020, she was re-elected to a full term, which commenced on January 1, 2021.

In May 2021, an anonymous complaint was received by OSC which led to an investigation. The Notice of Hearing issued by the Commission on February 23, 2024, alleged violations by Respondent of Canons 1, 2(A), 7(A)(9), 7(B)(1), and 7(B)(2) of the Code of Judicial Conduct and La. Const. art. V, § 25(C) for the following actions:

(1) making false and misleading statements during her judicial campaign about achieving the rank of captain in the United States Army and misleading the public to believe she was a combat veteran of Desert Storm and the wars in Iraq and Afghanistan, when in fact she served stateside as a nurse in the Army and was honorably discharged at the rank of first lieutenant after twice not being selected for promotion to captain,

(2) making false and misleading statements to police in the investigation of the reported burglary of her car while she was out campaigning, but which she claimed occurred while the car was parked in the driveway of her home, and

(3) withholding information and providing false, incomplete, or misleading information during the investigation by OSC.

After a hearing on October 3, 2024, proposed findings of facts and conclusions of law were submitted to the Commission by the Hearing Officer, who concluded that Respondent had "little, if any credibility, especially given her position as judge" because she "made so many significant false and misleading statements to the voting public, the Baton Rouge Police Department, her homeowner[']s insurance company (USAA), and the Judiciary Commission and OSC" and "flagrant" attempts to hide the truth.

In conjunction with her appearance before the Commission, the allegations in the Notice of Hearing were found to have been proven by the OSC with clear and convincing evidence, both in the present proceedings and in the events underlying it, given that "she was dishonest and misleading, failed to disclose or provide relevant information, and obfuscated the truth." The Commission determined that the facts, along with its conclusions of law, support discipline and recommended that Respondent be removed from office without pay and ordered to pay reimbursement of $9,449.83.

This court now reviews the Commission's findings of facts and conclusions of law to determine what discipline, if any, should be imposed.

**Campaign Representations Regarding Military Service**

Respondent made her prior military service the focal point of her judicial campaigns. She emphasized her qualifications and background in multiple editions

2

of the *Central City News*, a monthly Baton Rouge community newspaper. All nine of her advertisements in the *Central City News* contained a picture of Respondent in Army fatigues with the caption stating that she was a "Proud U.S. Army Captain and Veteran of Desert Storm, Iraq, and Afghanistan Wars (enlisted as a private E-1 and rose to Captain)." Seven of the nine ads were full-page and highlighted statements that Respondent "served our country for 13 years in the U.S Army, as both enlisted solider and Commissioned Officer during Desert Storm, Iraq, and Afghanistan Wars." Additionally, Respondent disseminated a campaign sign which pictured her wearing Army fatigues, combat helmet, and holding a military rifle next to the caption "Captain U.S. Army." During an in-person candidate forum in February 2020, Respondent informed the audience that she "served ... through three wars, Desert Storm, Iraq, Afghanistan."

## Car Burglary Investigation and Insurance Claim

On Friday, February 28, 2020, after she had been campaigning door-to-door in the Sherwood Forest area of Baton Rouge, Respondent reported an alleged car burglary.[1] Before contacting the police, she moved her car to the driveway of her Sherwood Oaks home, about three miles away from the burglary scene. When her husband arrived, Respondent called 911 to report the burglary. When the 911 operator asked, "what's the address," Respondent gave her home address and did not mention that the car burglary happened at a different location; nor did she mention that she moved her car after the burglary took place.

In response to the 911 call, a Baton Rouge Police Department officer was dispatched to Respondent's home. Body camera footage showed that on his arrival, Respondent greeted the officer and stated, "We were all out campaigning, I came back here, the cars are parked like this," while pointing at her car in her driveway.

---

[1] Although the Commission found no evidence of fraud in connection with the reports made by Respondent in connection with the alleged car burglary, Respondent's ever-changing accounts of the incident and her lack of candor in this regard are disconcerting.

She then gestured to her husband, whose car was parked behind hers in the driveway, and stated, "Well, he just got here, so his car wasn't here." She then pointed back to her car, stating, "When we came back, that door, that passenger side door was open," the glove compartment was open, and the car had been ransacked.

The officer asked Respondent when she last saw her car untouched and when she noticed the door was open, so that he could go around the neighborhood to ask if anyone had cameras that may have recorded something. Respondent gave an approximate time frame but made no effort to clarify that the burglary occurred several miles away. At the end of the encounter, the officer gave Respondent a victim assistance card with his name and badge number, which he explained stated "the date of the incident, the incident type is a vehicle burglary, and ... the incident address is your house." Respondent did not correct the officer about where the burglary occurred.

The initial police report reflects that Respondent reported the following items missing from her car: a makeup bag containing $400 in cash and approximately $500 worth of makeup; an Yves St. Laurent purse containing credit cards, her identification, medication, and $3,000 in cash; and an Apple MacBook computer. On Monday, March 2, 2020, Respondent reported to the police additional items that she realized were missing from her car, including a Rolex watch, two bracelets, her passport, and one Gucci shoe. Although Respondent subsequently reported to her insurance company that a third bracelet and her diamond engagement ring were also taken from her car during the burglary, Respondent never reported to the police that her ring had been stolen. In total, the replacement cost value of all stolen items in a claim made by Respondent with USAA (her homeowner's insurer) was $38,464.90.[2]

---

[2] When Respondent first called USAA to report the loss, she did not tell the insurer where the burglary occurred or that she had relocated the car before calling the police. Nothing in the claims file indicates that Respondent at any point during the claims process told USAA that the burglary occurred away from her home and that she moved the car to her home afterwards.

4

In settlement of her claim, USAA paid Respondent $24,204.11 (actual cash value less deductible).

**Commission's Investigation**

Relative to campaign representations about her military service, by a letter dated June 1, 2023, OSC requested complete copies of her military records. Receiving no response, OSC served Respondent's counsel with a subpoena duces tecum on July 6, 2023, to which she responded on August 7, 2023, claiming she did not have the military records in her possession and was not the custodian of the records. On August 24, 2023, OSC sent Respondent a Request Pertaining to Miliary Records form for her signature, authorizing the government to release her military records to OSC. Having received no response, OSC sent additional requests on October 25, 2023, and November 6, 2023, for the military records or the executed authorization form. After still receiving no response, OSC submitted unsigned documents directly to the government on January 9, 2024. The Army complied with the request on April 15, 2024, by sending copies of Respondent's military records.

Relative to the car burglary, OSC received Respondent's initial response to the allegations contained in the complaint in which she unequivocally asserted that she "did not submit an insurance claim to her insurer after the crime" and attached her State Farm *auto* policy and list of claims. Respondent further stated that she "did not submit any information--much less any false information--to her insurance carrier after the February 2020 incident." Because her response was silent as to any policy with or claims made to USAA (the insurer specifically mentioned in the complaint), OSC requested clarification of the claim history regarding USAA. A supplemental response filed on November 8, 2021, in which she acknowledged that "a homeowner's claim was filed [with USAA] in connection with the February 28, 2020, vehicle burglary incident" and asserted there was a "mistake" in her initial response, in that "the word 'auto' was inadvertently omitted from in front of the

5

word 'insurance.'" The Commission noted that even with the correction, the initial response would not have been fully responsive to the inquiry about her insurance claims because the complaint specifically named USAA. Instead, the initial response appeared designed to cloud the issue and divert attention to the lack of claims with State Farm.

Respondent's explanation for why she initially failed to acknowledge that she had made a claim with USAA was found to not be credible. She testified that she believed the anonymous complaint against her arose when a campaign worker, who later became disgruntled and left her campaign, heard her tell the police that her insurance was with State Farm and she then filed a claim with USAA. The Commission found this explanation is nonsensical as it did not reasonably explain why Respondent would think it relevant to disclose only that she did not make any claims with her auto insurer, State Farm, rather than disclosing the claims she did make with USAA under her homeowner's policy.

After the Commission notified Respondent of its investigation into the allegations that she filed a false police report, fraudulent insurance claim, and misrepresented the circumstances of the car burglary, she sent a second supplemental response to OSC on March 9, 2022, wherein, among other things, she provided a letter from USAA with a claim number. OSC then subpoenaed USAA's file associated with that claim number. Many months later, OSC verbally learned from USAA that the claim number in question pertained solely to the diamond engagement ring, which had not been included in the police report and that all other stolen property was claimed under a different USAA policy and claim number. On learning for the first time that a ring had been reported stolen to USAA and was the subject of an insurance claim, as well as learning there was a second claim related to the burglary, OSC issued a new subpoena for the other claim number. The Commission was troubled by Respondent's initial failure to disclose the USAA

6

claim in response to allegations of potential insurance fraud, as well as her claim for the ring, which had not been reported to the police as stolen.

Respondent's testimony surrounding the insurance claim for the ring was found by the Commission to have further diminished her overall credibility. When asked at the hearing why she had only disclosed one claim number after being notified of the Commission's investigation, she testified she had made only "one claim," and it was USAA that opened a second claim for the ring under a homeowner's policy issued to her husband. The documentation eventually provided by USAA directly contradicted her testimony, showing that Respondent inquired many times about making a separate claim for her ring on her husband's homeowner's policy.

According to its representative, USAA was not aware of any evidence of fraud or attempted fraud by Respondent. Although the Commission did not find any evidence of fraud, it found that Respondent's evasiveness and failure to be forthcoming with OSC about the facts surrounding her insurance claims after the car burglary raised legitimate concerns and could stem from an initial mistaken belief that her losses would only be covered if the burglary occurred right outside of her house. The Commission further found that Respondent's lack of forthrightness about her insurance claims led to unnecessary confusion and delay in OSC's investigation.

Like the Hearing Officer, the Commission found that the record demonstrates that the lack of candor demonstrated by Respondent in her judicial campaigns, in the handling of her car burglary incident, and with the Commission violated Canons 1, 2(A), 7(A)(9), 7(B)(1), and 7(B)(2) of the Code of Judicial Conduct, as well as La. Const. art. V, § 25(C). Given the totality of the misconduct that the Commission found to be proven by clear and convincing evidence, the Commission recommended that Respondent be removed from office to protect the public and its

7

confidence in the integrity of the judiciary and to purge the judiciary of any taint of disrepute.

## DISCUSSION

The sole issue presented is whether this court should accept the Commission's recommendation that Respondent be removed from office. Article V, Section 25(C) of the Louisiana Constitution vests this court with exclusive and original jurisdiction in judicial disciplinary proceedings and provides substantive grounds for disciplinary actions against a judge. The court has adopted the Code of Judicial Conduct, which supplements the grounds for disciplinary actions on judges. Before discipline can be imposed, charges against a judge must be proven by clear and convincing evidence. **In re Hunter**, 02-1975, p. 3 (La. 8/19/02), 823 So.2d 325, 328.

### Campaign Representations Regarding Military Service

The Commission found that the statements regarding Respondent's military service were false and misleading in several ways. Respondent did not serve in any capacity during Operation Desert Storm, which took place in 1991, when she was only 16 years old. Her entire military service was stateside. Her claim that she was a veteran of three wars gave the false impression that she served in combat areas overseas. She did not. Her claim that she obtained the rank of captain in the Army was also false and misleading. It was discovered that Respondent separated from the U.S. Army Reserve "as a result of being twice non-selected for promotion to the rank of captain" and records specifically state that she was honorably discharged on July 31, 2010.[3]

---

[3] Respondent testified that she requested to be discharged from the Army on her own accord and claimed she "never received any documentation that I was denied twice for Captain." The Commission found this testimony is not supported by the record and is directly contradicted by documents produced by the Army.

8

Respondent argued that the campaign ads in the *Central City News* contained statements which she did not write, authorize, or see (specifically that she was a captain in the Army) and which went beyond the "push card" she had designed and given to the owner/editor of the *Central City News*. According to Respondent, there was no discussion or negotiation between herself and the owner/editor about the content of the ads and that she never once saw the ads, despite paying $7,550 to run nine ads over two election campaigns. Respondent ultimately acknowledged that she is responsible for the ads, although she attributed her lack of oversight in this regard to the COVID pandemic and her mother's cancer treatment.

The anonymous complaint submitted to the Commission included photographs of Respondent's campaign sign in which she was holding a rifle and wearing a helmet next to the caption "Captain U.S. Army." While Respondent later acknowledged that she received the photograph with the complaint in May 2021, she asserted, for the first time at the October 2024 hearing before the Hearing Officer, that the photograph had been altered to include the caption "Captain." However, she failed to provide any plausible explanation as to why she had not raised this issue after OSC first sent it to her. The Commission stated that it did not make sense that an anonymous complainant would try to alter a photograph of the sign and not allege in the narrative portion of the complaint that Respondent lied about her rank.[4] Moreover, in April 2023, in a sworn statement to OSC, Respondent affirmed under oath twice that she attained the status of "Captain." She later admitted at the hearing that she was not "fully paying attention to the question." The Commission did not find this testimony to be credible given that a reasonable judge should know how to answer questions honestly under oath.

---

[4] The helmet Respondent wore in the photograph on the campaign sign appears to bear a captain's rank insignia; however, she never contended the insignia was added when the photo was submitted as part of the complaint. Notably, the anonymous complaint did not allege the ads were false or contained false information, but rather claimed the ads violated Department of Defense directives.

The Commission did not find Respondent's details about her service when testifying credible because she gave the false impression that she served in combat areas overseas when she referred to herself as a veteran of Desert Storm and the wars in Iraq and Afghanistan. The military records revealed that her service included duties as a medical laboratory assistant and nurse, which are both commendable. However, she would not reasonably be considered a war veteran. A 2020 video advertisement revealed that she was featured wearing an Army patrol hat and interacting with Army reservists dressed in fatigues. The video narration stated that she was "no stranger to being on the front line during the call of duty," which also gave the false impression that she served in a capacity other than a nurse or medical laboratory technician stateside. The Commission did not understand why she would intentionally lie or misrepresent herself in this light instead of lauding her actual accomplishments. The Commission stated that this conduct amounted to "stolen valor."

Respondent's failure to engage in proper oversight of her campaign ads is a violation of Judicial Canon 7. Further, the statements provided by Respondent were not mere exaggerations or misunderstandings. They involved repeated assertions about her rank, service, and participation in military operations in which she did not participate. The material used in the campaign had specific language and imagery designed to create the impression of combat service, despite her military service being stateside. This court, therefore, agrees with the Commission that Respondent's misrepresentation was intentional and warrants discipline.

## Car Burglary Investigation and Insurance Claim

The Commission found that Respondent engaged in a continued pattern of misleading information related to the investigation of her car burglary and the accompanying insurance claim. Respondent claimed that she knew at the time that her property loss would be covered by insurance regardless of the location of the

10

burglary. However, the Commission stated that the insurance coverage appeared to be the only reason she would purposefully not be forthcoming with the relevant information as to where the car burglary occurred.

During the ongoing investigation, Respondent stated under oath that she did not recall what she specifically said in the 911 call with the operator nor remember her exact conversation with the investigating officer. She stated that she did not recall such engagements because of her "stress" and "trauma" as a result of the incident. She claimed that she did not intend to convey that her car was parked in her driveway when the incident occurred. The Commission found her testimony not to be credible and concluded that Respondent intentionally misled the investigating police officer. Her July 15, 2021, response to the Commission stated that she "did not submit an insurance claim to her insurer after the crime" and attached only her State Farm auto insurance policy information. Since the complaint referenced USAA, OSC requested clarification. She later submitted a supplemental response on November 8, 2021, which acknowledged a homeowners claim with USAA, calling the prior omission a "mistake" caused by omitting the word "auto" before the word "insurance." The Commission stated this would not have been fully responsive because the inquiry was not exclusively limited to auto insurance but rather asked about the details of the car burglary and insurance claim.

The Commission found her initial failure to disclose the USAA claim not credible. Respondent stated that a campaign worker heard her tell the police that her insurance was with State Farm, but the Commission found that this did not make sense because she did not provide this explanation but only provided information on the lack of such claim with State Farm. The Commission notified her about the investigation of the police report and insurance fraud allegations. At that point, Respondent submitted a supplemental response providing her USAA claim number. It was revealed through a subpoena issued to USAA that the claim number provided

11

was linked to the diamond ring that she had not reported to the police, as well as other stolen property that was claimed under a separate USAA insurance policy with a separate claim number. The Commission issued another subpoena for the complete claim file under the second insurance policy. Respondent's testimony stating that she only made one insurance claim and that USAA, itself, opened a second claim, was contradicted by the USAA record noting that she inquired many times about the filing of separate claims. Although fraud was not found in this matter, the lack of transparency, evasiveness, and lack of candor caused unnecessary hinderance and delay in OSC's investigation.

This pattern of misrepresentation continued when Respondent had the opportunity to rectify her false statements but failed to do so. Instead, she contradicted many of her explanations proffered to the Commission. This court finds these inconsistences reveal a lack of candor. Instead of offering clarification, additional conflicting rationalizations exposed Respondent's dishonesty.

### Commission Investigation

The Commission found Respondent failed to cooperate with OSC's attempts to obtain documents reflecting her military service, which hindered and delayed the investigation of this matter. The Commission found that her explanations for failing to cooperate with OSC in obtaining her military records, either by directly providing the records or signing an authorization form for their release, were not credible.

Respondent claimed that she decided not to release her prior military records for the investigation because she suffered various traumas during her military service. She did not disclose this information in the initial investigation. At the outset she stated that she believed OSC inquired about the military records to confirm her age during Desert Storm. This explanation first appeared in her May 2024 response but was not supported by the record. No OSC letter ever indicated that the inquiry about the records was made to confirm her age. OSC had previously

12

requested her driver's license and high school graduation documentation. Furthermore, Respondent never mentioned to OSC that she was reluctant to produce her military records due to privacy concerns. She also failed to produce any documents supporting her allegations regarding the traumas in response to OSC's discovery requests. The Commission concluded she intentionally did not cooperate with its investigation to conceal information in her military records.

As discussed previously in this opinion, the Commission further found her pattern of misleading information extended to the investigation of the car burglary and subsequent insurance claim. Her initial failure to disclose the USAA claim, her misleading statements regarding the location of the burglary, her failure to mention the additional insurance claim, and her contradictory explanations all indicated that she withheld information or provided inaccurate information.

The Commission sent Respondent several requests and gave her ample time to respond to each request properly. Respondent's refusal to be forthcoming with the authorization of her military records and only offering an explanation after much delay resulted in a hinderance of the proceedings. Her response regarding all the USAA insurance claims lacked candor as well. Respondent should have disclosed the USAA claims, but she provided only one claim number when the record indicates more than one was opened.

For these reasons, judicial discipline is warranted in this matter, as the evidence reveals a persistent pattern of false information, misrepresentation, and lack of candor over the course of several years. Respondent violated Canons 1, 2(A), 7(A)(9), 7(B)(1), and 7(B)(2) of the Code of Judicial Conduct[5] and La. Const. art. V, § 25(C).

---

[5] Canon 1 provides that a judge shall uphold "the integrity and independence of the judiciary." Cannon 2(A) states that "[a] judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." Canon 7(A)(9) provides that a judge or judicial candidate shall not "knowingly make, or cause to be made, a false statement concerning the identity, qualifications, present position, or other fact

13

**Discipline**

The Commission has recommended that Respondent be removed from judicial office, and, as La. Const. art. V, § 25(C) provides, this court's authority to remove a judge from office can be invoked on the Commission's recommendation.

In imposing discipline, this court is guided by the following: (a) whether the misconduct is an isolated instance or an evidenced pattern of misconduct; (b) the nature, extent, and frequency of occurrence of the acts of the misconduct; (c) whether the misconduct occurred in or out of the courtroom; (d) whether the misconduct occurred in the judge's official capacity or in his private life; (e) whether the judge has acknowledged or recognized that these acts occurred; (f) whether the judge has evidenced an effort to change or modify his/her conduct; (g) the length of service on the bench; (h) whether there have been prior complaints about this judge; (i) the effect the misconduct has on the integrity of and respect for the judiciary; and (j) the extent to which the judge exploited his position to satisfy his personal desires. **In re Chaisson**, 549 So.2d 259, 266 (La. 1989).

*(a) Is the misconduct an isolated instance or does it evidence a pattern of misconduct and (b) what is the nature, extent, and frequency of the acts of misconduct?*

Respondent's misconduct is serious and was not isolated. She displayed a pattern of dishonesty. The misconduct began during her judicial campaigns in 2020, but she continued to lie and mislead the Commission throughout the investigation and proceedings, which her lack of candor unnecessarily obstructed and delayed. The nature of Respondent's misconduct is the most problematic aspect in that it calls into question her honesty and integrity--minimum qualifications the public expects from every judge.

concerning the candidate or an opponent." According to Canon 7(B)(1), a judge or judicial candidate shall "maintain the dignity appropriate to judicial office and act in a manner consistent with the impartiality, integrity and independence of the judiciary." Canon 7(B)(2) provides that a judge or judicial candidate shall "review and approve the content of all political advertisements produced by the judge or judicial candidate or his or her campaign committee ... before their dissemination."

*(c) Did the misconduct occur in or out of the courtroom and (d) did the misconduct occur in the judge's official capacity or in her private life?*

The misconduct did not occur in the courtroom nor in Respondent's official capacity as a judge. Respondent's initial misconduct occurred in her capacity as a judicial candidate and then continued as an incumbent running for reelection. Her dishonesty and evasiveness with the Commission occurred in her capacity as a sitting judge who had an obligation to act with the utmost candor in her dealings with the Commission.

*(e) Has the judge acknowledged or recognized that the acts occurred and (f) has she tried to change or modify her conduct?*

Prior to her appearance before the Commission, Respondent acknowledged that "she made exaggerated claims about her military service which she failed to properly verify or correct when given the opportunity," but she asserted "she did not intentionally lie about the nature or extent of her military service." Similarly, she "recognizes that she miscommunicated with law enforcement during a stressful period following a vehicle burglary," but "she did not intentionally seek to mislead the police officer responding to the vehicle burglary." To the extent Respondent belatedly acknowledged and apologized for some of her wrongdoing at the later stages of these proceedings, such proclamations ring hollow in the face of her specious attempts to explain away her actions or distract from the relevant issues. While judges are entitled and expected to present defenses and explanations for their conduct, those of Respondent were not credible, and she has not demonstrated acknowledgement of or accountability for her misconduct in any meaningful sense. Like the Commission, this court is concerned that Respondent did not genuinely acknowledge and understand her misconduct.

15

*(g) How long has the judge served on the bench?*

Respondent was not yet a judge when she originally misrepresented the nature and extent of her military service and the circumstances of the car burglary during her initial campaign. She was a brand-new judge when she repeated the campaign falsehoods about her military service on immediately running for a full term. She then continued this pattern of dishonesty with the Commission after it received the complaint and throughout this proceeding. Although she is still a relatively new judge, it does not take an experienced jurist to know that honesty is essential to being a judge. It is also a vital attribute of a nurse, attorney, and Army officer, which were Respondent's professions prior to her election to the bench.

*(h) Have there been prior complaints about this judge?*

Respondent has no prior judicial complaints.

*(i) What effect did the misconduct have on the integrity of and respect for the judiciary?*

Respondent's misconduct constitutes a severe and irreparable impact on the integrity of and respect for the judiciary. "Misrepresentations of a candidate's identity, qualifications or present position are misleading to the public and bring the judicial office into disrepute." **In re Cascio**, 96-2105, p. 4 (La. 11/25/96), 683 So.2d 1202, 1204. Here, Respondent has gone beyond mere misrepresentation that misled the public: she created a campaign sign falsely stating that she was an Army captain, paid for multiple campaign ads that reiterated this untruth, falsely conveyed to voters that she was a combat veteran of three wars, and lied to the police about where the burglary of her car occurred, despite the investigating officer's words inviting clarification. She then misled, evaded, and lied to the Commission throughout its investigation and this proceeding when: she told OSC in her initial response to the complaint that she made no insurance claim following the burglary; twice lied under oath at her sworn statement about being an Army captain; refused to provide her

16

military records to prevent discovery of her lies; withheld or provided misleading information about the police report and her insurance claims; and provided inconsistent and unbelievable explanations for her actions while under oath before the Hearing Officer and the Commission.

*(j) To what extent did the judge exploit her position to satisfy personal desire?*

There is no evidence that Respondent exploited her position as judge to satisfy her own personal desires.

Concerning the removal of a judge from office, this court in **In re Hunter** stated:

> Removal of a judge from duly-elected office is undoubtedly the most severe sanction this court may impose under the authority granted to us by the constitution. Not only is the judge removed from his or her present judicial office, but removal also precludes the former judge from becoming a candidate for judicial office for a minimum of five years and until his or her eligibility to seek judicial office is certified by this court. Consequently, we recognize that removal of a duly-elected member of the judiciary is an extremely serious undertaking that should be carried out with the utmost care because it disrupts the public's choice for service in the judiciary.

> On the other hand, the constitution vests in this court the duty to preserve the integrity of the bench for the benefit of the public by ensuring that all who don the black robe and serve as ministers of justice do not engage in public conduct which brings the judicial office into disrepute. To that end, we have recognized that the primary purpose of the Code of Judicial Conduct is to protect the public rather than to discipline judges. Likewise, the objective of a judicial disciplinary proceeding is not simply to punish an individual judge but to purge the judiciary of any taint.

> We are mindful that the people have a right under our state constitution to elect to judicial office the man or woman of their choosing, so long as that individual meets the qualifications required of him or her to be a candidate. Logically, the people also have the correlative right to remove an incumbent judge whom they believe to be unworthy, for whatever reason, of the honor of serving them as a judge, but they may accomplish that objective only by refusing to re-elect him or her when that judge stands for re-election. However, our state constitution, which the voters adopted on April 20, 1974, provides for a means of removing a sitting judge from judicial office under certain prescribed circumstances. The power to remove from office a sitting judge, and thereby counter the decision of the voters, is most assuredly an awesome responsibility. But the duty to exercise that authority has been vested in, and entrusted to, this court by the people

of this state through our constitution, and it is an obligation to the people of this state that we are required to take seriously. ...

*Id.*, 02-1975 at 11-13, 823 So.2d at 333-34 (internal citations, quotations, and footnote omitted). Moreover, in pertinent part, La. Sup.Ct. Rule XXIII, § 10 provides:

> The failure or refusal of a judge to cooperate in an investigation, or the use of dilatory practices, frivolous or unfounded responses or arguments, or other uncooperative behavior may be considered by the Commission in determining whether or not to recommend discipline to this Court and may bear on the severity of the discipline actually recommended.

This matter involves a pattern of alleged mistakes, misstatements, misdirection, and efforts to misguide the investigation. One who is tasked with separating fact from fiction in a court of law must be trusted to discern the truth. Believability, honesty, and truthfulness are characteristics that are crucial to serving as a judge. Trust is among the most essential traits a judge must have; it is only by being trustworthy that trust can be built.

Discipline must impress the significance of Respondent's transgressions and unforthright disposition toward the Commission during its investigation. See **In re Free**, 16-0434, p. 53 (La. 6/29/16), 199 So.3d 571, 603 (observing the judge's "appreciation of the depth and extent of his misconduct has evolved rather slowly over the course of the proceedings."). As previously indicated, the Hearing Officer ultimately concluded that Respondent had "little, if any credibility, especially given her position as a judge" because she "made so many significant false and misleading statements to the voting public, the Baton Rouge Police Department, her homeowner[']s insurance company (USAA), the Judiciary Commission, and OSC." According to the Hearing Officer, Respondent's "attempts to hide the truth were flagrant and only made the OSC more suspicious, leading it to expend more time and resources in order to get the information needed to evaluate" the allegations

18

against her, and her "evasive and noncooperative responses and tactics only compound her lack of credibility."

Even before this court, no remorse was demonstrated and her excuse for her lack of candor was a "lack of focus." Judges must be focused to ensure they fulfill their responsibilities.

This matter presents an unfortunate situation. The true story of Respondent's military service is laudable but, as the Commission indicates, her exaggeration amounts to "stolen valor."

In light of the facts presented in this matter,[6] the litigants and the public will not trust, and will always question, Respondent-judge's discernment, integrity, and trustworthiness. Although reluctant to remove an official elected by the people from the bench, this court finds that the lack of candor in the campaign, in the reporting of the burglary incident, and throughout this investigation demonstrates removal from office is the only appropriate sanction to ensure the trust and integrity of the system of justice which is, itself, of fundamental importance in the system of government. Any lesser discipline would undermine the entire judicial discipline process and diminish the strict obligation of judges to be truthful in the face of an investigation by the Commission.

While there may be some political appeal to impose a sanction of removal from the bench only for the balance of her current term, thereby allowing the voting public to determine her fate, this court cannot engage in making a political decision. The sanction imposed by this court must reflect an appropriate sanction for the

---

[6] Thomas Jefferson stated, "[h]onesty is the first chapter in the book of wisdom." Albert Einstein indicated, "[w]hoever is careless with the truth in small matters cannot be trusted with important matters." In this matter, the Hearing Officer (a retired Judge) and the Commissioners (comprised of attorneys, Judges, and citizens who are not Judges or attorneys) observed Respondent testify and found she engaged in intentional deception and obstructive behavior. The Latin phrase *falsus in uno, falsus in ominbus* was used in common law to state if one testifies untruthfully in one matter, the individual has no credibility at all. Although a discredited doctrine, it remains a rule of caution in legal matters. The adage by James Altucher, "[h]onesty is the fastest way to prevent a mistake from turning into a failure," unfortunately, applies in this matter.

actions evidenced in this record, not based on the remaining length of the judge's term. To say, "let the people decide" if she is worthy to serve as a judge, is to relinquish our role and defer to a politically driven process. Her lack of candor and cooperation and her attempts to hide the truth were "flagrant" and are deserving of the forfeiture of her right to engage in the political process for five years. Those who continuously engage in falsehoods simply should not sit in judgment of others.

## DECREE

For the reasons stated herein, it is ordered, adjudged, and decreed that Respondent, Judge Tiffany Foxworth-Roberts of the Nineteenth Judicial District Court, Division M, Parish of East Baton Rouge, State of Louisiana, be, and is hereby, removed from office, and that her office be, and is hereby, declared to be vacant. Further, Respondent is ordered, pursuant to La. Sup.Ct. Rule XXIII, § 26, to refrain from qualifying as a candidate for judicial office for five years and until certified by this court as eligible to become a candidate for judicial office. Finally, exercising the discretion allowed this court by La. Sup.Ct. Rule XXIII, § 22, Respondent is cast with $9,449.83 for the costs incurred in the investigation and prosecution of her case.

**REMOVAL FROM JUDICIAL OFFICE ORDERED.**

**SUPREME COURT OF LOUISIANA**

**No. 2025-O-01127**

**IN RE: JUDGE TIFFANY FOXWORTH-ROBERTS**

*Judiciary Commission of Louisiana*

**ORDER**

Considering this court's judgment, it is hereby further ordered that Respondent, Judge Tiffany Foxworth-Roberts of the Nineteenth Judicial District Court, Division M, Parish of East Baton Rouge, State of Louisiana, be immediately suspended and disqualified from exercising any judicial functions.

For the Court:

_____
Chief Justice, Supreme Court of Louisiana

# SUPREME COURT OF LOUISIANA

## No. 2025-O-01127

## IN RE: JUDGE TIFFANY FOXWORTH-ROBERTS

Judiciary Commission of Louisiana

**McCALLUM, J., additionally concurs and assigns reasons.**

The disciplinary action this Court has been forced to take is unfortunate because it should have been unnecessary. First, although diligent search has been made, our Judicial Canons have left no room for any lesser sanction that would not deprecate the seriousness of the conduct. Second, as the majority ably explains, Respondent's conduct during the investigation has arguably been more egregious than the initial allegations themselves.

One example of Respondent's conduct during the investigation is illustrative. Mr. Louis "Woody" Jenkins, Jr., the editor and publisher of two newspapers in East Baton Rouge Parish, the Central City News and the St. George Leader, in testimony this writer deems credible and against his own interest, admirably took responsibility for the content of his editorial and advertisements that ran in his publications. Yet, Respondent voided any benefit she could have received from this testimony by her continued obfuscation and misrepresentation concerning the very matters about which he testified, and for no apparent reason other than deception.

Rather than take responsibility for her conduct, Respondent has persisted with tortured explanations and excuses. Therefore, her conduct has done little, if anything, to show remorse or contrition. While the current sanction may appear harsh in juxtaposition with recent judicial disciplinary actions, past actions of the

Court should not prevent us from doing what is appropriate now and into the future.

**GRIFFIN, J., dissents and assigns reasons.**

I respectfully dissent from the majority's decision to remove Judge Foxworth-Roberts from the judiciary. While I recognize the degree of the conduct at issue, in my view a suspension without pay for the remainder of her judicial term is more appropriate.

"[T]he primary purpose of the Code of Judicial Conduct is the protection of the public rather than to simply discipline judges." *In re Best*, 15-2096, p.14 (La 6/29/16), 195 So.2d 460, 468. This Court's duty is to preserve the integrity of the judiciary and maintain public confidence. Removal of a judge from duly elected office is the most severe sanction and should be imposed sparingly as it disrupts the public's choice for service in the judiciary. *In re Hunter*, 02-1975, p.11 (La. 8/19/02), 823 So.2d 325, 333. Removal should be reserved for instances where a judge's actions demonstrate a fundamental inability to perform judicial duties or evidence a persistent pattern of misconduct while in office. Judge Foxworth-Roberts' misconduct occurred while she was a judicial candidate and continued during her term in office. It did not, however, occur during court proceedings or in Judge Foxworth-Roberts' capacity as a judge.

Judge Foxworth-Roberts has served as a judge since 2020. A suspension for the remainder of her term without pay is sufficient to reinforce ethical and judicial compliance. Suspension promotes accountability, the opportunity for rehabilitation,

and will allow Judge Foxworth-Roberts to run for re-election such that the voters may decide her future service in the judiciary.

**SUPREME COURT OF LOUISIANA**

**No. 2025-O-01127**

**IN RE: JUDGE TIFFANY FOXWORTH-ROBERTS**

Judiciary Commission of Louisiana

**GUIDRY, J., dissents and assigns reasons.**

I respectfully dissent from the majority's opinion. Based on her misconduct, Judge Foxworth-Roberts should not be allowed to complete the remainder of her current term. We have a constitutional duty to protect the public and preserve the integrity of the Judiciary and not allowing her to complete her current term fulfills that responsibility. Beyond that, we must respect the role that the voters play in our democratic system of government. After all, these judgeships were created by and exist for the benefit of our citizenry. With an upcoming election around the corner next year, they have the right to judge for themselves whether she will ever wear a robe again. I will not disenfranchise our voters and deprive them of that opportunity to be the judge. I maintain my confidence in our citizenry and respect their right to ultimately decide who will sit in judgment of their affairs. It is not only paternalistic and presumptuous but also repugnant to the democratic process to do otherwise. Therefore, I respectfully dissent from the majority's opinion.

**SUPREME COURT OF LOUISIANA**

**No. 2025-O-01127**

**IN RE: JUDGE TIFFANY FOXWORTH-ROBERTS**

**Judiciary Commission of Louisiana**

**Cole, J., additionally concurs for the reasons assigned by McCallum, J.**